[No. S018665. May 17, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
MILTON OTIS LEWIS, Defendant and Appellant.

---

**COUNSEL**

Marc D. Stolman for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, William G. Prahl and Mathew Chan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KENNARD, J.—A jury convicted defendant Milton Otis Lewis of one count of first degree murder (Pen. Code, § 187),[1] and found true the special circumstance allegations of robbery murder (§ 190.2, former subd. (a)(17)(i) [now subd. (a)(17)(A)]), and burglary murder (§ 190.2, former subd. (a)(17)(vii) [now subd. (a)(17)(G)]). The jury also convicted defendant of two counts of robbery, one count of burglary, and one count of attempted murder. At the penalty phase, the jury returned a verdict of death for the first degree murder with special circumstances. After denying defendant's automatic motion to modify the death verdict (§ 190.4, subd. (e)), the trial court sentenced defendant to death for the first degree murder, and to a total determinate term of 21 years in state prison for the remaining counts.

Defendant's appeal to this court is automatic. (§ 1239, subd. (b).) We will affirm the judgment in its entirety.

### I. FACTS

#### A. *The Prosecution's Guilt Phase Evidence*

In December 1988, James and Helen Rumsey lived in a unit of the Shasta Pines Apartments in Redding. Marie Baker, a methamphetamine user, lived in another unit in the same building. Staying with Baker at that time was 15-year-old Amy Hadix, who also used methamphetamine regularly.

June Rice, another renter at the Shasta Pines Apartments, sold drugs from her apartment. On December 21, 1988, defendant, who knew Rice and was a methamphetamine user, came to Rice's apartment with a man who wanted to sell some drugs. Rice directed them to Baker's apartment.

On December 24, 1988, around 10:00 or 11:00 a.m., the Rumseys came to Baker's apartment to give her back some money they owed her. In defendant's presence, James Rumsey pulled a wallet from his back pocket and removed $50, which he handed to Baker. A short time later, also in defendant's presence, Baker's eight-year-old daughter commented on James Rumsey's money, saying, "Oh, Mom, he's got gobs."

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

Later that day, defendant went to June Rice's apartment and bought a half-gram of methamphetamine with money he had taken from a man after a fistfight in Baker's apartment. After injecting the drugs, he told Rice they were "decent." When he returned to Baker's apartment, however, he complained to Baker and Hadix that the drugs were no good. They told him to return to Rice's apartment to get either more drugs or his money back. When Hadix said she was going downstairs to visit another renter, defendant went with her.

As Hadix passed the Rumseys' first floor apartment, she noticed the door was ajar, and she greeted James, who was seated in an easy chair just inside the doorway. Suddenly, defendant jumped on James and stuck a knife in his neck. He then reached into James's back pocket, pulled out his wallet and opened it, but found no money in it.

When Helen Rumsey tried to come to her husband's aid, defendant kicked her hard in the groin area, causing her to fall. As she got up, defendant thrust the knife into her throat, and she fell to the floor again. Defendant returned to James and tried to reach into the front pocket of his pants, but he was unsuccessful. He turned James's body over and retrieved a pocketknife from his back pocket. Defendant then picked up a gun belonging to James from a nearby table and held it to Helen's forehead as she struggled to her knees. Yelling obscenities at her, defendant threatened to shoot unless he got some money. He pulled the trigger, and Helen heard a click. She then crawled to where James was lying, opened the wallet defendant had looked in but discarded, and removed $250 in $50 bills that had been hidden in a secret compartment. After Helen handed defendant the money, he picked up James's pocketknife and gun, grabbed the knife he had brought with him, and walked out the door.

Meanwhile, Hadix had run to Tim Smith's apartment and told him that defendant was killing the Rumseys. A few minutes later, defendant appeared at Smith's door and told Hadix to come with him to June Rice's apartment. On arrival, defendant pulled James's gun from his pocket and pointed it at Rice, complaining about "bunk dope." Hadix ran to the bathroom in fright but came out a minute later after hearing a neighbor yell that Helen Rumsey had been stabbed. She ran to Baker's apartment, and defendant followed.

Once back inside Baker's apartment, defendant went to the kitchen to wash blood from his hands. He ordered Baker to hold the gun for him, but she refused. Defendant then handed Baker $250 in $50 bills and told her to hold the money for him. He told Hadix to come with him, and they left. Baker later found defendant's buck knife on her kitchen counter. She

wrapped it and threw it away. As to the money defendant had left with her, she spent $50 on groceries and the rest on methamphetamine.

After leaving Baker's apartment, defendant, accompanied by Hadix, hid the gun in a shed behind the apartment complex. They then proceeded to a garbage bin belonging to a nearby church. Defendant opened the lid, threw Hadix inside, and then jumped in himself. They hid there for six or seven hours. During this time, Hadix asked defendant why he had killed James Rumsey. Defendant replied, "It had to be done." The next morning, defendant and Hadix returned to the shed to retrieve the gun, and, at Hadix's suggestion, they went to her parents' home, which was close by.

Shortly thereafter, the police arrived at the home of Hadix's parents. When Hadix's father opened the door for the officers, defendant fled into the bathroom. Defendant ignored the officers' orders to put his gun down and come out. Forty-five minutes later, defendant emerged, leaving the gun in the bathroom.

An autopsy showed that James Rumsey died from hemorrhaging caused by a five-inch-deep knife wound to the front of the neck. Helen Rumsey sustained knife wounds to the side and back of her neck; one of these wounds was directly over the carotid artery.

Forensic testing showed that the gun retrieved from the bathroom of Hadix's parents' home was the gun taken from the Rumseys' apartment. The gun held a full magazine, but there was no round in the chamber.

### B. *The Defense Guilt Phase Case*

Testifying in his own defense, defendant said he had gone to Baker's apartment for the first time on December 21, 1988, accompanied by a friend who wanted to sell Baker some methamphetamine. Defendant was homeless and had no money, so he stayed with Baker for the next three days. During that time, there was drug use and constant activity in the apartment, and defendant neither slept nor ate.

On December 24, just after dark, defendant bought methamphetamine from June Rice and injected it while still in her apartment. Five minutes later, he bought more methamphetamine from Rice's companion and, again, promptly injected it. The drugs had an immediate and powerful effect. When he went back to Baker's apartment, he told Baker he had bought drugs from Rice and the drugs were "decent." Baker was angry with defendant for not sharing the drugs with her and suggested he get some more drugs from Rice

by complaining that what he had bought was no good. Feeling badgered and upset, defendant left the apartment with Hadix to see Rice. Defendant carried a steak knife in his hand in case he encountered violence at Rice's apartment. On the way, Hadix harangued him about getting more drugs.

When he and Hadix came to the Rumseys' apartment, defendant mistakenly believed it was Rice's apartment. He became confused and could feel himself "ball up inside" because he was afraid he was going to be attacked by Rice's companion. Suddenly, he heard a whirring sound and saw James Rumsey start to get out of his chair by the door. Defendant became scared and stabbed him once, not knowing whom he was stabbing. When Helen Rumsey rushed at him, he stabbed her also.

Defendant recalled removing James's wallet and not finding any money in it. He admitted yelling at Helen, "Bitch, if you don't get me more money, I'll get you, too." He also remembered that after Helen handed him the money from the wallet, he picked up James's gun from the table, but he denied pointing it at Helen's forehead and pulling the trigger.

Defendant remembered leaving the Rumseys' apartment and proceeding to Rice's residence. Once inside, he pulled out the gun and demanded more drugs. About a minute later, he was interrupted when a neighbor came to the door seeking help for the Rumseys.

When defendant returned to Baker's apartment, he dropped the knife in the sink full of dishwater. At Baker's direction, he put the knife in the garbage, which he and Hadix took and disposed of on their way out.

When called as a defense witness, the investigating officer, Sergeant Lebak, testified that Hadix had told him of entering the Rumseys' apartment with defendant.

## C. *The Penalty Phase*

At the penalty phase of the trial, the prosecution presented evidence of six incidents of unadjudicated violent criminal activity, one robbery that resulted in a felony conviction, and a felony drug conviction.

In December 1971, a police officer saw defendant fighting with a woman on a street corner in Los Angeles. Defendant shook the woman, threw her to the sidewalk, struck her in the head with his fist, and knocked her against an apartment building, rendering her unconscious. Defendant resisted arrest, and the officer used a choke hold to subdue him.

In July 1980, around 10:00 p.m., defendant entered a liquor store in Southgate and approached the clerk, Kiro Horiuchi. Defendant said: "I have a gun; I don't want to shoot you." Defendant was holding one hand behind a straw hat. Defendant told Horiuchi to empty out the register, and Horiuchi complied. Defendant took around $250 to $300. Horiuchi's wife activated a silent alarm, and defendant was arrested nearby within minutes. He did not have a gun when arrested. For this incident, defendant was convicted of robbery (§ 211), a felony.

In February 1985, at a house in Weed, defendant was arguing with his mother when defendant's uncle, Leon Johnson, told defendant to stop. Defendant followed Johnson around the house and, when Johnson refused to fight, defendant stabbed him twice in the chest with a folding knife having a blade four and a half to five inches in length. Defendant left the house, but he returned a short time later, surrendered to the police, and signed a confession.

In January 1986, defendant was married to a woman named Willie B. Shumlai. During an argument, he hit her in the eye with his fist.

In August 1986, defendant and Debra Swango had been living together in defendant's house in Weed for around eight months, and she was three months pregnant. Defendant wanted her to move out, and during an argument about that, he hit her with his fist, causing a black eye and a cut to her lip that left a scar. He also dragged her out of the house.

In September 1986, defendant encountered George Toombs, the father of Willie B. Shumlai, at a supermarket parking lot in Weed. Toombs, who was then 63 years old, was sitting in his pickup truck. Defendant had a handgun, and he fired a shot that punctured one of the truck's tires. When Toombs asked defendant why he did it, defendant said: "Next time you hear son of a bitch I'm going to be shooting your God damn guts out."

On an evening in November 1986, Andrew Greene encountered defendant outside a bar in Weed known as the Nightcap. Greene warned defendant to stay away from one of Greene's sons. Defendant told Greene to wait, and then defendant left. More than an hour later, defendant entered the bar shouting for Greene and threatening his life. Defendant was wearing a trench coat. As John Rogers, the bar's owner, approached him, defendant reached into his coat. Rogers pulled the coat down over defendant's shoulders, revealing a revolver in a holster. Rogers took the gun from defendant.

In June 1987, defendant entered a plea of guilty to a charge of sale of methamphetamine (Health & Saf. Code, § 11379), a felony.

The defense presented no evidence in mitigation at the penalty phase. Defense counsel's terse closing argument was a plea for mercy based on biblical references and lines from William Shakespeare's The Merchant of Venice.

## II. PRETRIAL AND JURY SELECTION ISSUES

### A. *Waiver of the Right to a Speedy Trial*

The prosecution filed the information on February 14, 1989, and defendant was arraigned the same day. After reading aloud the charges and allegations contained in the information, the trial court informed defendant of various rights, including the right to proceed to trial within 60 days, and the court asked defendant if he understood those rights. When defense counsel requested more time before defendant entered his plea, the court asked defendant if he would agree to have the 60-day period commence from February 27 rather than from February 14, and defendant agreed. During the next 12 months, defendant waived his right to a speedy trial on three more occasions.

At a hearing on February 5, 1990, counsel for both sides asked the trial court to set defendant's trial on August 14, 1990. The court responded: "All right. I think what we'll probably do, then, is just go ahead and try to gear it up for the usual screening selection of a jury. Unless—Unless there's going to be some problem. So, let's figure, at least for the moment, get started picking a jury then on August the 14th." Defendant agreed to waive time.

On August 14, 1990, after defense counsel explained to defendant that he and the prosecutor planned to discuss with the judge the wording of the jury questionnaire and the procedures for questioning potential jurors, defendant personally waived his right to be present. The next day, prospective jurors were assembled for jury selection. One day later, on August 16, the prospective jurors were sworn.

Defendant contends the failure to commence trial on or before August 14, 1990, in the absence of his waiver of the right to a speedy trial, violated both California law and the Sixth Amendment of the United States Constitution. We disagree.

Under article I, section 15 of the California Constitution and the Sixth Amendment of the United States Constitution, a criminal defendant has the right to a speedy public trial. This right protects the defendant " 'from having criminal charges pending against him an undue length of

time.' " (*People v. Wilson* (1963) 60 Cal.2d 139, 148 [32 Cal.Rptr. 44, 383 P.2d 452], quoting *People v. Godlewski* (1943) 22 Cal.2d 677, 682 [140 P.2d 381]; see also *People v. Martinez* (2000) 22 Cal.4th 750, 760 [94 Cal.Rptr.2d 381, 996 P.2d 32] [explaining purposes of federal constitutional guarantee].) To implement this constitutional right, our Legislature enacted section 1382, which requires dismissal when a defendant is not "brought to trial" within the statutorily prescribed period after the filing of the information. (*Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772, 776 [200 Cal.Rptr. 916, 677 P.2d 1206].) A defendant is "brought to trial" under section 1382 when the court has "committed its resources to the trial, and the parties must be ready to proceed and a panel of prospective jurors must be summoned and sworn." (*Rhinehart v. Municipal Court, supra*, at p. 780.)

A defendant charged with a felony must be brought to trial within 60 days of arraignment on the information or indictment, but a defendant who consents to the setting of a trial date beyond the 60-day period may be "brought to trial" on or within 10 days after the date to which consent was given. (§ 1382, subd. (a)(2)(B).) Here, defendant consented to a trial date of August 14, and he was brought to trial two days later on August 16 when a panel of prospective jurors was sworn. Because trial began well within the statutory 10-day grace period, defendant's statutory and constitutional speedy trial rights were not violated, and he was not entitled to a dismissal.

B. *Jury Selection*

Defendant raises several claims challenging the selection of the jury in his case. As appears below, none has merit.

1. *Failure to administer oath to prospective jurors*

In a hearing held on September 25, 1990, outside the presence of prospective jurors, the trial court asked counsel whether the prospective jurors should have taken the jurors' oath under Code of Civil Procedure section 232 before answering the written questionnaires about their views on the death penalty and other matters. The court noted that the prospective jurors had taken this oath in the court's presence before answering any questions orally, and that each prospective juror had signed the questionnaire under penalty of perjury. The court observed, however, that the opening paragraph on the questionnaire incorrectly stated that the jurors had been sworn by the court clerk.

The prosecutor saw no problem in the failure to administer the oath for the questionnaires because he considered the questionnaires simply a guide in

orally questioning the jurors. Defense counsel too saw no error in the procedures that had been followed. The trial court then ordered the questioning of prospective jurors to resume.

Defendant contends the trial court's failure to follow the proper procedures for administering the oath to prospective jurors as required by Code of Civil Procedure section 232 violated his federal constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Code of Civil Procedure section 232 requires a specified oath to be administered to prospective jurors before examination.[2] Respondent counters that it is questionable whether having prospective jurors fill out questionnaires is an "examination" within the meaning of Code of Civil Procedure section 232.

There is no decision addressing the latter point directly, but the language of Code of Civil Procedure section 232 suggests respondent's proposed reading of the statutory command is too narrow. The oath administered under Code of Civil Procedure section 232 requires prospective jurors to agree to accurately and truthfully answer " 'all questions . . . concerning [their] qualifications and competency.' " (Code Civ. Proc., § 232, subd. (a).) Moreover, our recent decisions describing the judicial practice of conducting voir dire in a capital case by having prospective jurors give written answers to a jury questionnaire imply that a juror questionnaire is part of the "examination" for purposes of Code of Civil Procedure section 232. (See *People v. Waidla* (2000) 22 Cal.4th 690, 713-714 [94 Cal.Rptr.2d 396, 996 P.2d 46] [no error in trial court's denial of defense request to conduct voir dire of prospective jurors where prospective jurors had answered 25-page questionnaire under penalty of perjury]; *People v. Earp* (1999) 20 Cal.4th 826, 851-855 [85 Cal.Rptr.2d 857, 978 P.2d 15] [trial court's voir dire procedure did not violate constitutional commands].)

■ Although defendant is correct that prospective jurors should have been sworn under Code of Civil Procedure section 232 before filling out their questionnaires, he fails to establish that he was prejudiced by the trial court's failure to administer the oath at that juncture. (See *United States v. Martin* (6th Cir. 1984) 740 F.2d 1352, 1358 [error in failing to administer oath to jury until after government had presented case-in-chief harmless

---

[2]Code of Civil Procedure section 232 provides in relevant part: "(a) Prior to the examination of prospective trial jurors in the panel assigned for voir dire, the following perjury acknowledgement and agreement shall be obtained from the panel, which shall be acknowledged by the prospective jurors with the statement 'I do': [¶] 'Do you, and each of you, understand and agree that you will accurately and truthfully answer, under penalty of perjury, all questions propounded to you concerning your qualifications and competency to serve as a trial juror in the matter pending before this court; and that failure to do so may subject you to criminal prosecution.' "

where defendant failed to show any prejudice by delay and no objection was made]; *Cooper v. Campbell* (8th Cir. 1979) 597 F.2d 628, 629 [no evidence that delay in swearing in jury prejudiced defendant's right to jury trial, fair trial, or due process].) Here, the prospective jurors signed their questionnaires under penalty of perjury and were sworn under Code of Civil Procedure section 232 before being personally questioned in open court. Defendant does not assert, nor does the record suggest, that the prospective jurors took their obligation to truthfully answer the questions posed to them on paper any less seriously than their duty to do so during oral questioning by the trial court and counsel. Nor does anything else in the record suggest the voir dire examination was inadequate. (See *People v. Earp, supra*, 20 Cal.4th at p. 852; *Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188 [101 S.Ct. 1629, 1634, 68 L.Ed.2d 22].)

Defendant contends that by failing to ascertain that the prospective jurors had been properly sworn before filling out their questionnaires, his trial counsel provided constitutionally deficient representation. Because defendant fails to show he was prejudiced by the jury selection procedures in his case, however, he cannot establish a violation of his Sixth Amendment rights.

### 2. *Challenges for cause against prospective jurors*

Defendant next contends that the trial court violated his rights to a fair trial and an impartial jury guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by excusing three prospective jurors for cause on the prosecutor's challenges.

█ Under both the federal and state Constitutions, a sentencing jury in a capital case must be impartial. (*People v. Williams* (1997) 16 Cal.4th 635, 666-667 [66 Cal.Rptr.2d 573, 941 P.2d 752]; see also *Morgan v. Illinois* (1992) 504 U.S. 719, 726-728 [112 S.Ct. 2222, 2228-2229, 119 L.Ed.2d 492].) A prospective juror whose views about capital punishment, either for or against, would " ' "prevent or substantially impair the performance of his [or her] duties as a juror" ' " is not impartial and therefore may be challenged for cause. (*People v. Williams, supra*, at p. 667, quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) We will uphold a trial court's ruling on a for-cause challenge by either party "if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." (*People v. Mayfield* (1997) 14 Cal.4th 668, 727 [60 Cal.Rptr.2d 1, 928 P.2d 485]; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

### a. *Prospective Juror Harold G.*

At the outset of voir dire, Prospective Juror Harold G. said he had no personal convictions that would cause him to automatically decide which penalty to impose and he could follow the trial court's instructions and reach an appropriate verdict. During the prosecution's examination, however, Harold G. confirmed he had answered "yes" to a questionnaire item asking, "Do you believe there is any reason why you might have any difficulty in objectively and impartially serving as a juror in this case?" The prosecutor then asked him if he would still answer "no" to the question posed to him on the questionnaire as to whether he could set aside his personal feelings about the death penalty law and follow the law as explained by the court. He replied that his answer would still be "no."

Although he made contradictory statements about his ability to set aside his own personal views and follow the law, Harold G. ended his examination with the declaration that he could not set aside his personal views. Under these circumstances, the trial court did not abuse its discretion in excusing Harold G. for cause. The record does not support defendant's complaint that the trial court failed to ask enough questions during voir dire to determine whether the challenge for cause was proper.

### b. *Prospective Juror Robert T.*

When Prospective Juror Robert T. stated during voir dire he was "not completely sold on that death penalty," the trial court admonished him that his personal views were not to be taken into consideration and that he must follow the court's instructions. Robert T. responded that he could set aside his personal feelings and apply the law as the court explained it. But when the prosecutor asked him whether, in light of his convictions about the death penalty, he would be capable of deciding for himself to vote for the death penalty if that was what the evidence showed and the law indicated, Robert T. replied, "I'm not positive I could, you know." And when the prosecutor asked, "Wouldn't it be fair to say you just can't conceive of a situation where you'd vote for the death penalty?," he responded, "I really don't think so."

Given these responses to the prosecutor's questions, we are satisfied that the trial court did not abuse its discretion when it excused Robert T. for cause. Defendant argues that Robert T.'s response of "I really don't think so" meant he found the prosecutor's assessment of his inability to apply the death penalty in any setting to be inaccurate. This interpretation is untenable in light of Robert T.'s other comments. Equally unpersuasive is defendant's

contention that the trial court improperly relied on answers to the unsworn questionnaire to excuse Harold G. and Robert T. As the record shows, these prospective jurors took the required oath before being orally examined, and they confirmed their questionnaire responses during that oral examination.

### c. Prospective Juror Leonard B.

On voir dire, Prospective Juror Leonard B. said he might have difficulty if he was asked to decide the penalty and such a decision would weigh on his conscience. He also said he had been opposed to the death penalty for a number of years. On further questioning by the prosecutor, Leonard B. said: "I can conceive of situations, maybe where I had a personal emotional involvement, where I would go along with it. But, in general, it would be very disturbing to me to feel for the rest of my days that I voted in favor of the death penalty." He reiterated the point later when he stated, "It's conceivable to me that I would vote in favor of the death penalty but I doubt it very much." He ended by declaring, "I'm a flexible person but not that flexible, I think." After considering defense counsel's argument pointing out that the juror had stated there were circumstances under which he could vote for the death penalty, the trial court sustained the prosecutor's challenge for cause.

The ruling was not an abuse of discretion. A prospective juror may not be excused for cause simply because of a strong opposition to capital punishment if the juror can nevertheless follow the trial court's instructions and fairly consider imposing the death penalty in a specific case. (*Adams v. Texas* (1980) 448 U.S. 38, 44-45 [100 S.Ct. 2521, 2526, 65 L.Ed.2d 581]; see also *Wainwright v. Witt, supra*, 469 U.S. at p. 424 [105 S.Ct. at p. 852]; *People v. Ashmus* (1991) 54 Cal.3d 932, 963 [2 Cal.Rptr.2d 112, 820 P.2d 214] [prospective juror who expresses opposition to death penalty not properly excused for cause if juror reveals ability to consider imposing death penalty as a "reasonable possibility"].) Here, however, Leonard B. did not merely acknowledge his opposition to the death penalty, he said he doubted very much he would vote for the death penalty, and he thought he was not flexible enough to do so against his personally held views. These comments amply support the trial court's conclusion that Leonard B.'s death penalty views would substantially impair his ability to follow the court's instructions and the law.

### 3. Denial of defense challenges for cause

Defendant contends the trial court erred in denying two defense challenges for cause. Here, the record shows defendant accepted the jury after

having exercised only five of the 26 peremptory challenges allotted to him. Therefore, his claim of error is not preserved for appeal. (*People v. Waidla, supra,* 22 Cal.4th at p. 715; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248].) ■ To preserve a claim based on the trial court's overruling a defense challenge for cause, "a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so." (*People v. Williams, supra,* 16 Cal.4th at p. 667.)

Defendant acknowledges he did not exhaust his peremptory challenges, but he argues we should abandon the requirement of exhaustion of peremptories because it violates federal constitutional principles. We have previously considered and rejected identical arguments. (*People v. Raley* (1992) 2 Cal.4th 870, 905 [8 Cal.Rptr.2d 678, 830 P.2d 712] [declining to reconsider view that failure to exhaust peremptory challenges shows lack of prejudice from erroneous denial of for-cause challenge].) Because defendant presents no new grounds for reexamining the rule, we decline his request to do so here.

### 4. *Fair cross-section of the community*

Pointing out that none of the jurors deciding his case was African-American, defendant posits that the racial composition of the venire pool did not reflect an adequate cross-section of the community, in violation of his federal and state constitutional rights. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) He asserts that the venire's racial composition was potentially significant here because he is an African-American accused of killing a White person.

■ A criminal defendant is guaranteed the right to be tried by a fair and impartial jury drawn from a representative cross-section of the community. (*People v. Wheeler* (1978) 22 Cal.3d 258, 266, 277 [148 Cal.Rptr. 890, 583 P.2d 748].) But a defendant who does not object to the panel or move to quash the jury venire on this ground has not preserved the issue for appeal. (*People v. Champion* (1995) 9 Cal.4th 879, 906-907 [39 Cal.Rptr.2d 547, 891 P.2d 93]; *People v. Fauber* (1992) 2 Cal.4th 792, 816 [9 Cal.Rptr.2d 24, 831 P.2d 249].) This is the case here.

Even if properly before us, this claim lacks merit. To establish a prima facie violation of the right at issue, a defendant must show: (1) the assertedly excluded group is a "distinctive" group in the community; (2) the group's representation in venires from which juries are selected is neither fair nor reasonable in relation to the number of such individuals in the community;

and (3) the underrepresentation is due to "systematic exclusion of the group in the jury-selection process." (*Duren v. Missouri* (1979) 439 U.S. 357, 364 [99 S.Ct. 664, 668, 58 L.Ed.2d 579]; *People v. Massie* (1998) 19 Cal.4th 550, 580 [79 Cal.Rptr.2d 816, 967 P.2d 29].) "A defendant cannot establish a prima facie case of systematic exclusion of a distinctive group merely by presenting statistical evidence that the group is underrepresented in the jury pool, venire, or panel." (*People v. Massie, supra,* at p. 580, fn. omitted; *People v. Howard* (1992) 1 Cal.4th 1132, 1160 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People v. Bell* (1989) 49 Cal.3d 502, 524 [262 Cal.Rptr. 1, 778 P.2d 129].) Instead, he or she must show that the underrepresentation " 'is the result of an improper feature of the jury selection process.' " (*People v. Massie, supra,* at p. 580, quoting *People v. Howard, supra,* at p. 1160.)

Here, defendant acknowledges he lacks evidence that any disparity in representation of African-Americans in the venire was the result of an improper feature in the jury selection process. He nonetheless urges this court to reconsider the requirement that a defendant present something more than statistical evidence of a disparity to satisfy this prong of the three-part test for establishing a prima facie case of violation of the fair cross-section requirement. Defendant fails to provide any reasons why a defendant's burden in this regard should be lightened. Accordingly, we decline to revisit the issue here. (See *People v. Bell, supra,* 49 Cal.3d at pp. 528-531 [discussing why statistical showing of underrepresentation is inadequate to meet defendant's burden of showing systematic exclusion].)

### 5. Cumulative effect of asserted errors

Defendant contends the cumulative effect of the asserted errors in jury selection denied him an impartial jury, fair trial, due process of law, and a reliable guilt verdict in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We have concluded that the trial court's error in not administering the oath to prospective jurors before they answered the jury questionnaires did not prejudice defendant. Otherwise, we have found no merit in any of defendant's properly preserved claims of error. Accordingly, there can be no cumulative effect warranting reversal. (*People v. Mayfield* (1993) 5 Cal.4th 142, 197 [19 Cal.Rptr.2d 836, 852 P.2d 331]; *People v. Frank* (1990) 51 Cal.3d 718, 736 [274 Cal.Rptr. 372, 798 P.2d 1215].)

### III. GUILT PHASE ISSUES

#### A. Admission of Evidence

##### 1. Evidence of uncharged robbery

At the guilt phase, prosecution witness Amy Hadix started to describe a fight between defendant and a man she had never seen before that occurred

in Marie Baker's apartment several hours before James Rumsey was killed. Defense counsel objected that this was irrelevant. At a sidebar conference, defense counsel further argued the evidence involved an alleged prior bad act that was unrelated to and dissimilar from the charged offenses and was unduly prejudicial. After hearing from counsel for both sides, the trial court permitted Hadix to testify that defendant obtained an unknown sum of money from the man.

Later, during cross-examination of defendant, and outside the jury's presence, the prosecutor requested that the previous line of questioning be reopened. He pointed out that when defendant was arrested he was in possession of a driver's license belonging to Robert Southard, the man he had fought in Baker's apartment hours before James Rumsey's death. He also noted that by defendant's own admission, he took $52 from Southard and used it to buy drugs from June Rice. The prosecutor argued that this evidence was highly probative of defendant's intent in entering the Rumseys' apartment, particularly in light of defendant's testimony that he entered the unit by mistake and with no intent to steal. The trial court found the evidence admissible for the limited purpose of showing defendant's state of mind, concluding that the probative value of the evidence exceeded any prejudicial effect. The court also said it would give the jury a limiting instruction.

When cross-examination resumed, defendant testified he bought methamphetamine from June Rice on December 24 with money he had taken from Southard after beating him up. On redirect examination, defendant explained he fought Southard after Southard had made insulting and racist comments to him. He admitted taking Southard's money while Southard was bent over on the floor with his wallet sticking out of his back pocket. Defendant said: "[I]t come [sic] to me at that point to reach in his back pocket, take the wallet, take the money."

Defendant contends the evidence involving Southard was admitted in violation of state evidentiary law and federal constitutional principles.

■ Evidence of prior criminal acts is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . .)," but not to prove the defendant carried out the charged crimes in conformity with a character trait. (Evid. Code, § 1101.) "To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses. . . . [¶] . . . [¶] A lesser degree of similarity is required to establish relevance on the issue of common design or plan. . . . [¶] The least degree of similarity is required to establish relevance on the issue of

intent. [Citation.] For this purpose, the uncharged crimes need only be 'sufficiently similar [to the charged offenses] to support the inference that the defendant " 'probably harbored the same intent in each instance.' [Citations.]" ' " (*People v. Kipp* (1998) 18 Cal.4th 349, 369-371 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 379 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

As we have observed, however, evidence of uncharged misconduct " 'is so prejudicial that its admission requires extremely careful analysis' " and to be admissible, such evidence " 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 [27 Cal.Rptr.2d 646, 867 P.2d 757].) Thus, "[t]he probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Kipp, supra,* 18 Cal.4th at p. 371.) On appeal, a trial court's ruling under Evidence Code sections 1101 and 352 is reviewed for abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10 [82 Cal.Rptr.2d 413, 971 P.2d 618]; *People v. Kipp, supra,* at p. 369; *People v. Carpenter, supra,* 15 Cal.4th at p. 380.)

■ Applying these principles, we find no abuse of discretion and no federal constitutional violation in the admission of the uncharged crimes evidence. In both the charged and uncharged crimes, defendant overcame the victim by force, then reached into the victim's back pocket to obtain his wallet. Both times, after having taken the money, defendant proceeded to June Rice's apartment to buy methamphetamine. Although the incidents themselves are not particularly distinctive, they are sufficiently similar to support an inference that defendant harbored the same intent in both instances, that is, to forcibly obtain cash from the victim. Contrary to defendant's assertion, this is not a case in which the evidence relating directly to the charged crimes was so compelling on the question of defendant's intent as to render the uncharged crimes evidence merely cumulative on the issue. (See *People v. Balcom* (1994) 7 Cal.4th 414, 422-423 [27 Cal.Rptr.2d 666, 867 P.2d 777].) Furthermore, the trial court limited any prejudicial impact of the uncharged crimes evidence by instructing the jury, in the language of CALJIC No. 2.50, that such evidence could not be considered to prove defendant was a person of bad character or that he had a disposition to commit crime.

In a related claim, defendant notes that although the trial court instructed the jury generally about the limited use of uncharged crimes evidence, it failed to pinpoint the particular evidence of the Southard fight in the

instruction.[3] He argues that the omission denied him due process of law and other guarantees under the state and federal Constitutions because the trial court had promised to give such a limiting instruction at the time it ruled the evidence admissible.

Defendant's constitutional claim is premised on what appears to have been a misstatement by the trial court. The record shows that in ruling on the admissibility of the Southard fight evidence, the trial court indicated it would "give a limiting instruction to the—I think it's under 2.60, CALJIC 2.60." This particular instruction, however, does not concern the limited use of evidence of uncharged crimes. Rather, it tells the jury to draw no inferences from the defendant's failure to testify at trial. Defendant cannot seriously dispute the supposition that the trial court simply misspoke when, after indicating it would give a limiting instruction, it made reference to CALJIC No. 2.60 instead of CALJIC No. 2.50. In any event, the trial court did instruct as promised, about the limited use of the uncharged crimes evidence. Although defendant now complains the trial court never "pin-pointed" the Southard fight evidence as the uncharged crimes evidence that was being admitted for the limited purpose of showing intent, he did not request such an instruction and therefore has not preserved the issue. (*People v. Freeman* (1994) 8 Cal.4th 450, 495 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) Nor did his attorney's failure to make such a request deny defendant the effective assistance of counsel. Because the jury was fully instructed on the limited use of uncharged crimes evidence under CALJIC No. 2.50, and there was no evidence of any incident to which jurors may have mistakenly believed the limiting instruction applied, defendant fails to make the necessary showing that, but for counsel's asserted deficiency, there is a reasonable probability that a determination more favorable to him would have resulted. (*In re Cudjo* (1999) 20 Cal.4th 673, 687 [85 Cal.Rptr.2d 436, 977 P.2d 66]; *Strickland v. Washington* (1984) 466 U.S. 668, 697 [104 S.Ct. 2052, 2069-2070, 80 L.Ed.2d 674].)

2. *Testimony about defendant's practice with a buck knife*

During cross-examination, defendant indicated he at one time had carried a buck knife and had told people he practiced with it. He denied having this

---

[3]The trial court instructed the jury: "Evidence has been introduced for the purpose of showing that the Defendant committed a crime other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that Defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

knife in his possession during the events leading to the present charges, however. In response to the prosecutor's question about how he used to practice with the knife, defendant explained that he would grab the knife from his pocket and open it as fast as he could. When defendant was then asked to describe this knife, defense counsel objected on relevancy grounds and the trial court sustained the objection.

On further cross-examination, defendant said he took a knife with him when he went to see June Rice about getting more drugs. The prosecutor asked defendant where he got this knife, and defendant replied that it came from Marie Baker's kitchen. The following exchange then took place:

Prosecutor: "Well, you have some familiarity with knives, didn't you?"

Defendant: "Not a specialist, I'm not, different than a steak knife."

Prosecutor: "Well, you used to practice with your buck knife?"

Defendant: "Not competition that I was preparing for, if you understand what I mean."

Defense counsel objected that this line of questioning was not relevant, but the trial court overruled the objection without comment. Defendant continued, "I wasn't practicing to kill somebody, if that's what you're trying to ask." The prosecutor then inquired, "What did the knife look like?" Defendant replied with a detailed description of his buck knife, including the length of the blade. The trial court interrupted the cross-examination, however, to ask defendant if he was describing the knife he got from Baker's kitchen. When defendant indicated he thought the prosecutor was asking him to describe the buck knife he used to carry, the trial court clarified that the prosecutor's question related to the knife taken from Baker's residence. After the prosecutor confirmed the trial court's understanding of the question, defendant described that knife as a regular kitchen-set knife with a black handle.

Defendant asserts that the prosecutor's questioning about the buck knife was misconduct and that the trial court, by overruling defense counsel's relevancy objection to this questioning, violated state evidentiary law and federal constitutional guarantees of fair trial, due process, fundamental fairness, and reliability of verdicts.

██ "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant

to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People v. Alcala* (1992) 4 Cal.4th 742, 797 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) Accordingly, a "witness may not be examined on matters that are irrelevant to the issue in the case." (*People v. Mayfield, supra,* 14 Cal.4th at p. 755.)

To the extent defendant's claim of prosecutorial misconduct is based on the prosecutor's question that elicited the response from defendant describing his buck knife, there was no impropriety. The prosecutor was asking defendant to describe the knife used in the charged crimes, the relevance of which cannot be called into question. The prosecutor is not to be faulted for defendant's misunderstanding of the question, which the trial court quickly clarified in any event.

█ As to the prosecutor's question about defendant's having formerly practiced with his buck knife, that was also proper. Defendant argues that evidence of his past practice was irrelevant because there was no evidence he used a buck knife to stab the victims. Although there was no direct evidence the murder weapon was a buck knife, the testimony on this issue was inconclusive and therefore did not foreclose that possibility. For example, Marie Baker testified that the knife defendant left on the kitchen sink after the stabbings was one she had never seen before. Moreover, evidence of defendant's earlier efforts to perfect his ability to quickly retrieve and open a pocketknife tends to undermine defendant's version of his attack on the victims as an unthinking response to being startled first by James Rumsey and then by Helen Rumsey.

Nor did the trial court err by not prohibiting the line of questioning under Evidence Code section 352 as more prejudicial than probative. The inquiry was relevant under applicable standards, as previously discussed. The trial court could reasonably conclude that any danger of prejudice in portraying defendant as having a propensity for violence did not substantially outweigh this probative value, and thus the trial court did not abuse its discretion in failing to exclude the evidence under Evidence Code section 352.

3. *Admission of victim photographs and crime scene videotape*

At a pretrial hearing to mark exhibits the parties intended to offer into evidence, defendant objected to seven color photographs of the victims and a videotape of the crime scene on the grounds these proposed exhibits were unduly gruesome and more prejudicial than probative. The trial court sustained the objection as to three photographs, but it overruled defense objections to the remaining four photographs and the videotape.

Defendant contends the admitted evidence was irrelevant because it had no bearing on the only contested issues, which concerned defendant's specific intent to commit the underlying felonies. He argues, moreover, that any probative value the evidence might possess was far outweighed by its prejudicial impact, given the graphic and bloody images portrayed.

The admissibility of victim and crime scene photographs and videotapes is governed by the same rules of evidence used to determine the admissibility of evidence generally: Only relevant evidence is admissible. (Evid. Code, § 350; see also *id., § 210; People v. Mendoza* (2000) 24 Cal.4th 130, 171 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Crittenden* (1994) 9 Cal.4th 83, 132 [36 Cal.Rptr.2d 474, 885 P.2d 887].) The trial court has broad discretion in deciding the relevancy of such evidence. (*People v. Smithey* (1999) 20 Cal.4th 936, 973 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Crittenden, supra*, at p. 132.)

Although defendant contends the photographs were inadmissible because they had no bearing on the only disputed question at trial (his mental state), we have made clear that the absence of a defense challenge to particular aspects of the prosecution's case or its witnesses does not render victim photographs irrelevant. (*People v. Smithey, supra*, 20 Cal.4th at pp. 973-974; *People v. Scheid* (1997) 16 Cal.4th 1, 17 [65 Cal.Rptr.2d 348, 939 P.2d 748]; *People v. Crittenden, supra*, 9 Cal.4th at pp. 132-133.) Here, the photographs of the victims' injuries and the videotape depicting the crime scene taken by investigating officers tended to corroborate Helen Rumsey's account of the incident and were therefore relevant to the prosecution's theory of robbery murder and burglary murder. (*People v. Mendoza, supra*, 24 Cal.4th at p. 171.) For example, a photograph showing murder victim James Rumsey as he was found by officers, with his face against the chair seat and his knees on the floor, supported Helen's testimony that shortly after defendant stabbed her husband, he turned the body over to gain access to James's back pocket after having tried but failed to get his hand inside the front pocket of James's pants. Two photographs depicting the deep stab wound in Helen Rumsey's neck not only corroborated her testimony but also showed the nature and placement of her wound; in this way, they tended to bolster the prosecution's theory that defendant entered the Rumseys' apartment with the intent to obtain money from them by force, and undermined defendant's testimony describing the stabbings as a startled, reflexive reaction to sudden movements by the victims. (*People v. Crittenden, supra*, 9 Cal.4th at p. 133.)

Defendant further asserts that because the bloody and graphic nature of the photographs and videotape must have inflamed the jury, the trial court erred in refusing to exclude the evidence as more prejudicial than probative

under Evidence Code section 352. Having reviewed the challenged exhibits, we are satisfied their admission violated neither state evidentiary law nor defendant's federal constitutional rights to fundamental fairness and reliability of verdicts. Although the blood-splattered surroundings and the images of the victims depicted in the photographs and crime scene videotape are disturbing to view, as such evidence always is (*People v. Crittenden, supra,* 9 Cal.4th at p. 134), none of these exhibits is unduly gruesome or inflammatory. (*People v. Mendoza, supra,* 24 Cal.4th at p. 171; *People v. Smithey, supra,* 20 Cal.4th at p. 974; *People v. Crittenden, supra,* at p. 134; *People v. Pride* (1992) 3 Cal.4th 195, 243-244 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

### B. *Sufficiency of the Evidence*

Defendant asserts the evidence adduced at trial was insufficient to establish he had the requisite mental state for robbery and burglary to sustain his conviction of first degree felony murder. In considering this claim, we examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—that would support a rational trier of fact in finding the essential element of intent beyond a reasonable doubt. (*People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *People v. Price* (1991) 1 Cal.4th 324, 462 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

Liability for first degree murder based on a felony-murder theory is proper when the defendant kills in the commission of robbery, burglary, or any of the other felonies listed in section 189. For conviction, the prosecution must establish that the defendant, either before or during the commission of the acts that caused the victim's death, had the specific intent to commit one of the listed felonies. (*People v. Anderson* (1968) 70 Cal.2d 15, 34 [73 Cal.Rptr. 550, 447 P.2d 942]; *People v. Proctor* (1992) 4 Cal.4th 499, 532 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) Thus, to find a defendant guilty of first degree murder based on a killing perpetrated during a robbery, the evidence must show the defendant intended to steal the victim's property either before or during the fatal assault. (§ 211; *People v. Sakarias* (2000) 22 Cal.4th 596, 619 [94 Cal.Rptr.2d 17, 995 P.2d 152]; *People v. Marshall, supra,* 15 Cal.4th at p. 34.) Conviction of felony murder in the commission of burglary requires proof that the defendant entered the residence with the intent to commit a felony or theft. (§ 459; *People v. Frye* (1998) 18 Cal.4th 894, 954 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Proctor, supra,* at p. 533.)

Here, we are satisfied that a rational trier of fact could have found beyond a reasonable doubt that defendant intended to steal from the Rumseys when he entered their apartment and assaulted them. The evidence at

trial showed: (1) in the month preceding the crime, defendant had neither money nor a place to live, and he was involved in drug activity; (2) on the day of the murder, defendant saw James Rumsey take $50 from his wallet and overheard Baker's eight-year-old daughter say that Rumsey had "gobs" of money; (3) several hours before the murder, defendant had fought with a man in Baker's apartment and had forcibly taken his money, which he used to buy methamphetamine; and (4) before leaving Baker's apartment and going to the Rumseys' apartment, defendant had armed himself with a knife.

Also, Helen Rumsey and Amy Hadix testified that when defendant followed Hadix past the opened door to the Rumseys' apartment, he pushed her out of the way and entered the residence, then quickly slammed the door shut after jumping on James Rumsey and stabbing him in the neck. Helen Rumsey further testified that after defendant had stabbed James and kicked her away as she approached, he removed the wallet from James's back pocket and went through it. When defendant found no cash in the wallet, he stabbed Helen in the throat, then pointed a gun at her head, yelling obscenities and demanding money.

Based on this evidence, a rational trier of fact could find beyond a reasonable doubt that defendant had formed the intent to steal before entering the Rumseys' apartment and attacking them. Although the evidence is circumstantial, the intent required for robbery and burglary is seldom established with direct evidence but instead is usually inferred from all the facts and circumstances surrounding the crime. (§ 21, subd. (a); *People v. Holt* (1997) 15 Cal.4th 619, 669 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Cain* (1995) 10 Cal.4th 1, 47 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. Gibbs* (1970) 12 Cal.App.3d 526, 549 [90 Cal.Rptr. 866].)

Defendant argues that his own testimony and that of the three primary prosecution witnesses—Marie Baker, Amy Hadix, and June Rice—established that he entered the Rumseys' apartment by mistake and without the specific intent to steal from them before the entry and attack. He points out that the prosecution's witnesses testified consistently with his own account of the incident and without contradiction that he had purchased methamphetamine from June Rice, that he discussed returning to Rice's apartment to complain about the drugs and attempt to get more, and that he did return to Rice's residence as originally planned after the stabbings of the Rumseys.

Even if we were to find that a rational trier of fact could draw from this evidence the inferences defendant suggests, reversal of the judgment would not be warranted. ▮▮▮ We have previously described the limited role of this court in assessing the sufficiency of the evidence supporting a conviction: If the circumstances reasonably justify the jury's findings as to each

element of the offense, the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139 [17 Cal.Rptr.2d 375, 847 P.2d 55]; *People v. Proctor, supra,* 4 Cal.4th at pp. 528-529.)

Defendant further asserts that uncontroverted evidence of his intoxication before and during the incident established he had not formed the intent to steal when he entered the Rumseys' apartment. Evidence of defendant's conduct after the murder casts serious doubt on his assertion that the testimony at trial showed he had acted in a frantic, drug-induced state. But even assuming for argument's sake that the evidence of defendant's methamphetamine and alcohol consumption before the commission of the crimes would permit an inference he actually lacked the requisite specific intent for robbery and burglary (*People v. Horton* (1995) 11 Cal.4th 1068, 1119 [47 Cal.Rptr.2d 516, 906 P.2d 478]), we conclude that reversal is not warranted. We have determined that the record contains substantial circumstantial evidence supporting the jury's findings on the question of defendant's intent. Having reached this conclusion under the applicable principles of appellate review outlined above, we reject defendant's challenge to the sufficiency of the evidence. (*People v. Ceja, supra,* 4 Cal.4th at p. 1138.)[4]

### C. *Jury Instructions*

#### 1. *Refusal to instruct on manslaughter*

The trial court instructed the jury on first degree felony murder and second degree implied-malice murder. (§§ 189, 188.) But the court refused defense counsel's request to instruct on the definition of manslaughter and, more specifically, on involuntary manslaughter based on commission of a lawful act that might produce death, without due caution and circumspection. (§ 192, subd. (b).) Counsel argued that the instruction was warranted because the jury could find from the evidence that defendant was carrying a knife in a lawful manner when he entered the wrong apartment, but that he did so while keyed-up and under the influence of drugs and alcohol and, because of this, reacted without due caution and circumspection. After

---

[4]Defendant asserts that evidence of his intoxication, coupled with his testimony that he was in fear when he entered the victims' apartment, supports a finding of voluntary manslaughter based on unreasonable self-defense because it established that he held an actual, albeit unreasonable, belief in the need to defend himself against James Rumsey. But this argument is beside the point. The issue here is not whether the evidence adduced at trial would support conviction of some lesser offense but rather whether the record contains substantial evidence in support of the conviction. As discussed above, we have determined that it does. (See *People v. Bean* (1988) 46 Cal.3d 919, 933 [251 Cal.Rptr. 467, 760 P.2d 996] [evidence that may be reconciled with finding of lesser degree of crime does not compel reversal].)

taking counsel's request under submission, the trial court declined to give the instruction, saying, "I can't see it either on voluntary or involuntary."

Defendant contends the trial court committed reversible error in refusing his requested instruction on involuntary manslaughter, and in failing to instruct on its own initiative on the theory of unreasonable self-defense, which would have permitted the jury to convict him of no crime greater than voluntary manslaughter.

■ "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence [and] . . . an erroneous failure to instruct on a lesser included offense constitutes a denial of that right . . . ." (*People v. Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on other points in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1], and in *People v. Breverman* (1998) 19 Cal.4th 142, 176 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present. (*People v. Breverman, supra,* at p. 154; *People v. Barton* (1995) 12 Cal.4th 186, 196 [47 Cal.Rptr.2d 569, 906 P.2d 531].) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton, supra,* at p. 201, fn. 8.)

■ Manslaughter, both voluntary and involuntary, is a lesser included offense of murder. (*People v. Ochoa* (1998) 19 Cal.4th 353, 422 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Barton, supra,* 12 Cal.4th at pp. 200-201; *People v. Berryman* (1993) 6 Cal.4th 1048, 1080 [25 Cal.Rptr.2d 867, 864 P.2d 40].) Involuntary manslaughter is defined to include a killing that occurs "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b); *People v. Prettyman* (1996) 14 Cal.4th 248, 274 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) When the defendant killed in the actual but unreasonable belief that he or she was in imminent danger of death or great bodily injury, this is termed "imperfect self-defense," and the killing is reduced from murder to voluntary manslaughter. (*In re Christian S.* (1994) 7 Cal.4th 768, 771, 773 [30 Cal.Rptr.2d 33, 872 P.2d 574]; *People v. Barton, supra,* at pp. 200-201.)

Defendant asserts there was substantial evidence warranting instruction on both involuntary manslaughter and voluntary manslaughter based on imperfect self-defense. He points to his testimony that he was afraid and "ball[ed]

up inside" and had used methamphetamine before setting out for June Rice's apartment armed with a knife in the event of a confrontation. He mentions also his own testimony that after mistakenly entering the Rumseys' apartment, he believed he was in danger when he heard a whirring noise and saw a blur coming at him and that he "stuck" the victims in response.

██ The testimony of a single witness, including the defendant, can constitute substantial evidence requiring the court to instruct on its own initiative. (*People v. Speaks* (1981) 120 Cal.App.3d 36, 40 [174 Cal.Rptr. 65]; see *People v. Turner* (1990) 50 Cal.3d 668, 690 [268 Cal.Rptr. 706, 789 P.2d 887].) But we need not determine whether the testimony defendant cites constitutes substantial evidence warranting instruction on involuntary manslaughter and voluntary manslaughter based on imperfect self-defense because, even if it does, the trial court's failure to so instruct was not prejudicial. ██ Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions. (*People v. Sedeno, supra,* 10 Cal.3d at p. 721.) Here, the trial court instructed the jury on first degree felony murder and the crimes of robbery and burglary. In addition, the court instructed the jury on theft as a lesser included offense of robbery and burglary, an instruction emphasizing that if defendant formed the intent to steal only after he had entered the Rumseys' apartment and assaulted them, he was guilty of the lesser crime of theft. The jury found defendant guilty of robbery and burglary, and it found true the special circumstance allegations that defendant killed James Rumsey in the commission of robbery and burglary. (§§ 211, 459, 190.2, former subd. (a)(17)(i), (vii) [see now subd. (a)(17)(A), (G)].) To render these verdicts, the jury had to find that defendant had already formed the intent to steal when he entered the Rumseys' apartment and assaulted them, thus necessarily rejecting defendant's version of the events. (See *People v. Earp, supra,* 20 Cal.4th at p. 886; *People v. Millwee* (1998) 18 Cal.4th 96, 157-158 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Parnell* (1993) 16 Cal.App.4th 862, 874 [20 Cal.Rptr.2d 302].)

For a similar reason, we reject defendant's contention that defense counsel's failure to request a jury instruction on unreasonable self-defense constituted ineffective assistance of counsel. Because the absence of such instruction did not prejudice him, defendant fails to make the necessary showing that, but for counsel's asserted deficiency, there is a reasonable probability that a determination more favorable to him would have resulted. (*In re Cudjo, supra,* 20 Cal.4th at p. 687; *Strickland v. Washington, supra,* 466 U.S. at p. 697 [104 S.Ct. at pp. 2069-2070].)

## 2. *Failure to give requested pinpoint instruction*

Defense counsel proposed, but the trial court declined to give, this jury instruction: "If you have a reasonable doubt whether the defendant had the intent to steal at the time the unlawful killing took place, you must find him not guilty of first degree murder." Defendant contends the trial court committed reversible error in failing to give this requested instruction because the omission left the jury with no guidance on the requirement of a "unified temporal relationship" between the perpetration of a felony and the killing of a victim for purposes of establishing felony murder. He asserts the refusal to so instruct the jury amounted to a failure to instruct on the defense theory of the case in violation of the Sixth Amendment, and denied him the rights to due process, fair trial, fundamental fairness and a reliable verdict.[5]

 To prove first degree murder based on a felony-murder theory, the prosecution must establish that the defendant intended to commit one of the felonies enumerated in section 189 "either prior to or during the commission of the acts which resulted in the victim's death." (*People v. Anderson, supra,* 70 Cal.2d at p. 34.) Conversely, when the killer forms the intent to commit an independent felony only after delivering the fatal blow to the victim, the felony-murder doctrine does not apply. (*People v. Jeter* (1964) 60 Cal.2d 671, 676-677 [36 Cal.Rptr. 323, 388 P.2d 355]; see also *People v. Gonzales* (1967) 66 Cal.2d 482, 486 [58 Cal.Rptr. 361, 426 P.2d 929] [jury properly instructed that intent to rob formed after infliction of mortal wounds is insufficient to support finding of first degree felony murder].)

Here, the relevant principles concerning the timing of the requisite intent to steal were adequately covered by the instructions given, CALJIC Nos. 8.21 and 9.40 (formerly No. 9.10), defining first degree felony murder and robbery, respectively.[6] (*People v. Hayes* (1990) 52 Cal.3d 577, 625-626 [276 Cal.Rptr. 874, 802 P.2d 376]; *People v. Hendricks* (1988) 44 Cal.3d 635, 642-643 [244 Cal.Rptr. 181, 749 P.2d 836].)

---

[5]The appellate record does not include either defense counsel's argument in support of the proposed instruction or the basis of the trial court's ruling refusing to give it. Defendant contends, without elaboration, that this omission in the record violates his constitutional rights to heightened reliability, due process, and meaningful appellate review. The claim lacks merit. Because defendant fails to explain how the state of the appellate record precludes this court from determining whether the trial court's ruling constitutes error, he has not met his burden of showing that the deficiencies have prejudiced him. (*People v. Padilla* (1995) 11 Cal.4th 891, 966 [47 Cal.Rptr.2d 426, 906 P.2d 388]; *People v. Osband* (1996) 13 Cal.4th 622, 663 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

[6]As given in this case, CALJIC No. 8.21 provides: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of first degree robbery or first degree burglary is murder of the first degree when the perpetrator had the specific intent to commit the crime of first degree robbery or first degree burglary. [¶] The specific intent to commit first degree robbery

Defendant acknowledges that in *People v. Hayes, supra,* 52 Cal.3d 577, we rejected an identical claim, finding no error in the trial court's refusal to give two jury instructions requested by the defense that related to the formation of intent to steal because the pattern instructions defining first degree felony murder and robbery that were given in the case, CALJIC Nos. 8.21 and former 9.10 (now No. 9.40), adequately covered the issue. (*People v. Hayes, supra,* at pp. 625-626.) He asserts, however, that *Hayes* is not dispositive of his claim because the wording of CALJIC No. 8.21 as given here was fundamentally different from the version given in *Hayes.* He points out that while the *Hayes* jury was instructed that felony murder requires a finding the unlawful killing occurred " '*as a result of the* commission of the crimes of robbery and burglary' " (*People v. Hayes, supra,* at p. 626, fn. 9, quoting CALJIC No. 8.21, italics added), the jury here was told that to convict of felony murder it must find the killing occurred "*during the* commission, or attempted commission of" robbery and burglary.

The differing language represents two options appearing in a bracketed portion of CALJIC No. 8.21, a standard instruction. Which one is given depends on whether the victim's death occurred close in time to the commission of the predicate felony or at a later period. (See Use Note to CALJIC No. 8.21 (6th ed. 1996) p. 392.) Under both variations of the standard instruction, however, the jury is properly informed that first degree felony murder applies if it is proven beyond a reasonable doubt that the defendant formed the intent to steal before or contemporaneously with, rather than after, the killing. Here, as in *People v. Hayes, supra,* 52 Cal.3d 577, the trial court did not err in refusing to give the requested instruction elaborating on CALJIC Nos. 8.21 and 9.40.

---

and the commission or attempted commission of such crime must be proved beyond a reasonable doubt. The specific intent to commit first degree burglary in the commission or attempted commission of such crime must be proved beyond a reasonable doubt. The specific intent required for first degree robbery and the specific intent required for first degree burglary are contained in the definitions of those offenses."

Former CALJIC No. 9.40, as given in this case, provided: "Defendant is accused in Count 2 and Count 4 of the crime of robbery. Every person who takes personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear, and with the specific intent permanently to deprive such person of property, is guilty of the crime of robbery. In order to prove such crime each of the following elements must be proved. [¶] One, a person had possession of property of some value, however slight. [¶] Two, such property was taken from such person or from the person's immediate presence. [¶] Three, such property was taken against the will of such person. [¶] Four, the taking was accomplished either by force, violence, fear or intimidation. [¶] And five, such property was taken with the specific intent to permanently deprive such person of the property."

### 3. *Adequacy of instruction on voluntary intoxication*

With defense counsel's assent, the trial court used a modified version of CALJIC No. 4.21 to instruct the jury on the relevance of evidence of defendant's intoxication to the question whether he formed the specific intents required to prove the charged crimes of robbery, burglary, and attempted murder, and the necessarily included offense of theft.[7] Defendant asserts the trial court erred in omitting from the standard instruction the first paragraph, which would have described for the jury the specific intent necessary for robbery or burglary. He argues the error was compounded by the trial court's failure to instruct on the lesser crime of manslaughter and on imperfect self-defense.

■■■ In assessing defendant's claim of error, we consider the entire charge to the jury and not simply the asserted deficiencies in the challenged instruction. (*People v. Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251], overruled on another point in *People v. Reyes* (1998) 19 Cal.4th 743 [80 Cal.Rptr.2d 734, 968 P.2d 445].) A trial court is not obliged to condense the required explanation of a legal rule or concept in a single instruction; a charge is not erroneous or prejudicial simply because a re-quired explanation is given in two instructions rather than one. (*People v. Burgener, supra*, at pp. 538-539.)

The record shows that in instructing the jury how evidence of voluntary intoxication relates to the question of specific intent, the trial court did not expressly define the specific intents required to establish the various crimes at issue in the case but instead stated as follows: "In the crime of robbery, burglary and attempted murder and the included or related crime of theft, a necessary element is the existence in the mind of the defendant of a certain specific intent, included in the definition of each crime." The "definition of each crime" was given in other instructions such as CALJIC Nos. 9.40 and 14.50, which set forth the elements of robbery and burglary, respectively, including the specific intents necessary to establish those crimes. The jury was also instructed under CALJIC No. 1.01 to consider the instructions "as a whole and in light of all the others."

In *People v. Ochoa, supra,* 19 Cal.4th 353, we found no reasonable likelihood a jury that had been similarly instructed would be confused or

---

[7]The trial court read the following modified version of CALJIC No. 4.21: "In the crime of robbery, burglary and attempted murder and the included or related crime of theft, a necessary element is the existence in the mind of the defendant of a certain specific intent, included in the definition of each crime. If the evidence shows that the defendant was intoxicated at the time of the alleged crime from the use of alcohol and drugs, you should consider that fact in determining whether the defendant had such specific intent. If from all the evidence you have a reasonable doubt whether the defendant formed such specific intent, you must find that he did not have such specific intent."

misled about the relationship between evidence of the defendant's voluntary intoxication and the formation of the specific intent required for proving the felony-murder charges at issue in that case. (*Id.* at p. 421; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1143 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Clark* (1993) 5 Cal.4th 950, 1021 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) Defendant fails to point to anything in the record suggesting grounds for reaching a contrary conclusion here. (See *People v. Welch* (1999) 20 Cal.4th 701, 757 [85 Cal.Rptr.2d 203, 976 P.2d 754] [finding similar claim of error waived by counsel's failure to request additional or clarifying instruction].)

Defendant also contends the trial court should have further defined voluntary intoxication for the jury by giving CALJIC No. 4.22 on its own initiative. He asserts the omission violated his federal constitutional rights to due process, fundamental fairness, confrontation of witnesses, and freedom from cruel and unusual punishment. That instruction states: "Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect or when [he] [she] willingly assumes the risk of that effect. [¶] Voluntary intoxication includes the voluntary ingestion, injecting or taking by any means of any intoxicating liquor, drug or other substance." (*Ibid.*)

There was no error. Because a trial court has no duty on its own initiative to give an instruction relating evidence of voluntary intoxication to the question of defendant's mental state generally (*People v. Ervin* (2000) 22 Cal.4th 48, 90-91 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Saille* (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588]), the trial court here had no obligation to clarify or elaborate on the voluntary intoxication instructions it gave. (*People v. Clark, supra,* 5 Cal.4th at pp. 1021-1022.)

Nor did the absence of an instruction further defining voluntary intoxication prejudice defendant. As previously noted, the modified version of CALJIC No. 4.21 told the jury: "[I]f the evidence shows that the defendant was intoxicated at the time of the alleged crime from the use of alcohol and drugs, you should consider that fact in determining whether the defendant had such specific intent." In addition, defense counsel urged the jury to find defendant lacked the specific intent to steal when he entered the Rumseys' apartment and attacked them, stressing the evidence of defendant's intoxication on methamphetamine and alcohol. (See *People v. Ervin, supra,* 22 Cal.4th at p. 91.) Because the absence of an instruction further defining voluntary intoxication did not prejudice defendant, we also reject his contention that trial counsel's failure to request CALJIC No. 4.22 violated his constitutional right to the effective assistance of counsel.

### 4. *CALJIC No. 2.90*

While conferring with the trial court and the prosecutor on jury instructions, defense counsel suggested a modification to CALJIC No. 2.90, the standard instruction on presumption of innocence and reasonable doubt. ▮ The pattern instruction in use during defendant's trial began, "A defendant in a criminal action is presumed to be innocent until the contrary is proved." Defense counsel requested that the word "until" be replaced by the word "unless" because, he argued, " 'until' is a word that presupposes that an event will happen and you are simply waiting for that eventuality to occur, where the word 'unless' more correctly defines the law." The trial court declined to adopt the requested modification, opting instead to follow the exact wording of CALJIC No. 2.90.[8]

Defendant renews the argument of his trial counsel by asserting that the standard instruction read in his case impermissibly shifted the burden of proof in violation of due process by suggesting to the jury that it will find him guilty and that he is only presumed innocent until that time. Relying on dictionary definitions, he contends that the term "unless" more accurately reflects the law and should replace the word "until" in CALJIC No. 2.90.

The challenged portion of the instruction derives from section 1096, which embodies "a cardinal rule of Anglo-American jurisprudence"—the presumption of innocence and its corresponding burden of proving a defendant. guilty beyond a reasonable doubt. (*People v. Morris* (1968) 260 Cal.App.2d 848, 849-850 [67 Cal.Rptr. 566].) That provision states in pertinent part, "A defendant in a criminal action is presumed to be innocent *until* the contrary is proved, and in case of a reasonable doubt whether his or her guilt is satisfactorily shown, he or she is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him or her guilty beyond a reasonable doubt." (§ 1096, italics added.)

Although other language in the standard reasonable doubt instruction used at defendant's trial has been strongly criticized by justices of both this court and the United States Supreme Court (see *People v. Freeman, supra,* 8

---

[8]The jury was instructed: "A defendant in a criminal action is presumed to be innocent until the contrary is proved. And in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows. It is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."

Cal.4th at pp. 525-526 (conc. opn. of Mosk, J.); *id.* at pp. 526-531 (conc. opn. of George, J.); *Victor v. Nebraska* (1994) 511 U.S. 1, 23 [114 S.Ct. 1239, 1251-1252, 127 L.Ed.2d 583] (conc. opn. of Kennedy, J.); *id.* at pp. 23-28 [114 S.Ct. at pp. 1251-1254] (conc. opn. of Ginsburg, J.)), we find no infirmity in the portion of CALJIC No. 2.90 defendant challenges here. Viewing that language in context and with reference to the entire charge (*People v. Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212]), we conclude that there is no reasonable likelihood that the jury in defendant's case would understand the instruction to mean that to convict defendant, the state could sustain its burden without proving his guilt beyond a reasonable doubt. Here, the instruction first informed the jury that "a defendant in a criminal action is presumed to be innocent until the contrary is proved" and that if there is a reasonable doubt as to his guilt, he must be acquitted. The next sentence stated that the just-described presumption of innocence "places upon the People the burden of proving him guilty beyond a reasonable doubt." The jury was then provided a definition of reasonable doubt. Contrary to defendant's argument, there is no reasonable likelihood that the jury understood the disputed language to mean it should view defendant's guilt as a foregone conclusion.

Defendant further argues that the part of CALJIC No. 2.90 defining the term "reasonable doubt" must have confused the jurors because the references to "moral evidence" and "moral certainty" invited them to convict him based on vague notions of "morality" in violation of his rights to due process, fair trial, fundamental fairness, and freedom from cruel and unusual punishment. He acknowledges the definition of reasonable doubt used in his case survived a similar constitutional attack in *Victor v. Nebraska, supra,* 511 U.S. 1. Echoing the view of Justice Mosk in his concurring opinion in *People v. Freeman, supra,* 8 Cal.4th 450, 526-528, defendant asserts, however, that the time has come for a judicial rewriting of the reasonable doubt instruction, since the Legislature has failed to act.

In *Victor,* the United States Supreme Court expressed the view that although the terms "moral evidence" and "moral certainty" do not render the standard instruction unconstitutional, they did not add anything of value. (*Victor v. Nebraska, supra,* 511 U.S. at p. 14 [114 S.Ct. at p. 1247].) Aware of the high court's concerns, we strongly recommended in *Freeman* that trial courts modify CALJIC No. 2.90 by omitting the references to moral evidence and moral certainty. (*People v. Freeman, supra,* 8 Cal.4th at p. 504, fn. 9.) Thereafter, the Legislature amended section 1096 by adopting the wording suggested in *Freeman* (Stats. 1995, ch. 46, § 1, p. 95), and CALJIC No. 2.90 was revised accordingly. Thus, the terms of which defendant here complains do not appear in the standard instruction now in use.

### 5. *Failure to give CALJIC No. 8.83.1*

The trial court instructed the jury in the language of CALJIC No. 2.02, on the sufficiency of circumstantial evidence to prove specific intent, and CALJIC No. 8.83, on the sufficiency of circumstantial evidence to prove a special circumstance generally.

Defendant faults the trial court for giving CALJIC No. 8.83 rather than a related instruction, CALJIC No. 8.83.1, on the sufficiency of circumstantial evidence to prove the specific intent necessary to prove a special circumstance. He argues that because the prosecution's evidence in support of the special circumstance allegation on this point was entirely circumstantial, the trial court was required to give the more specific CALJIC No. 8.83.1 rather than the more general CALJIC No. 8.83.

Although CALJIC No. 8.83.1 would have been an appropriate instruction in this case, it was not required. As we explained in *People v. Hines* (1997) 15 Cal.4th 997 [64 Cal.Rptr.2d 594, 938 P.2d 388], both CALJIC Nos. 8.83 and 8.83.1 are duplicative of a more general instruction, CALJIC No. 2.01, informing the jury how to consider circumstantial evidence to prove guilt, and a trial court does not err in refusing to give the pattern instructions pertaining more specifically to proof of special circumstance allegations on this basis. (*People v. Hines, supra,* at pp. 1051-1052.) Here, the trial court gave both CALJIC No. 3.31, on the required union between act and specific intent, and CALJIC No. 2.02, on the use of circumstantial evidence to prove specific intent generally. The court was not required to provide a repetitive instruction informing the jury, more specifically, how to evaluate circumstantial evidence of specific intent as it relates to proving the special circumstance allegations.

Defendant further asserts his counsel was incompetent for not requesting CALJIC No. 8.83.1. Although this instruction would have been appropriate, defendant's claim of inadequate representation must fail because he cannot establish prejudice from counsel's omission. Here, as noted, the trial court told the jury how to evaluate circumstantial evidence generally and explained that the specific intent with which an act is done may be shown by the circumstances surrounding the commission of the act. (CALJIC Nos. 2.00, 2.02.) The court also instructed the jury on the mental states required for both of the special circumstance allegations. (CALJIC No. 8.81.7.) Immediately after this instruction, the court instructed the jury how to consider circumstantial evidence in determining the truth of the special circumstance allegations. (CALJIC No. 8.83.) These instructions substantially covered for the jury how to evaluate circumstantial evidence of

specific intent as it related to special circumstances. The absence of a duplicative instruction specifically linking the use of circumstantial evidence of specific intent to the determination of the truth of the special circumstance allegations would not have changed the outcome of defendant's trial. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 220-221 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *People v. Rodrigues, supra,* 8 Cal.4th at pp. 1143-1144.)

### 6. *Failure to give unanimity instruction*

The trial court instructed the jury that defendant could be convicted of first degree felony murder based on a robbery or a burglary. Defendant complains the trial court's failure to instruct the jury that it must unanimously agree he was guilty of either robbery or burglary in order to convict him on a felony-murder theory lightened the prosecution's burden of proof in violation of federal constitutional principles.

 It is well settled that, to properly convict, a jury must unanimously agree that the defendant is guilty of the statutory offense of first degree murder beyond a reasonable doubt, but it need not decide which of several proffered theories of first degree murder liability governs the case. (*People v. Santamaria* (1994) 8 Cal.4th 903, 918 [35 Cal.Rptr.2d 624, 884 P.2d 81]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1185 [9 Cal.Rptr.2d 834, 832 P.2d 146]; *Schad v. Arizona* (1991) 501 U.S. 624, 630-645 [111 S.Ct. 2491, 2496-2504, 115 L.Ed.2d 555].) Defendant acknowledges that his claim of instructional error is contrary to precedent but urges nonetheless that we reconsider our earlier pronouncements. We have consistently rejected other requests to reexamine the point (see *People v. Carpenter, supra,* 15 Cal.4th at pp. 394-395; *People v. Osband, supra,* 13 Cal.4th at p. 688), and defendant advances no persuasive grounds for doing so here. In any event, the jury verdicts finding defendant guilty of both robbery and burglary, and the jury's true findings on the robbery-murder and burglary-murder special-circumstance allegations show that the jury unanimously agreed defendant was guilty of first degree felony murder under both of the prosecution's felony-murder theories. Thus, even if instructional error occurred, it did not prejudice defendant. (*People v. Carpenter, supra,* at p. 395.)

### D. *Inconsistent Verdicts*

At the guilt phase of trial, the jury returned verdicts finding defendant guilty as charged and finding to be true most, but not all, of the sentencing allegations connected to the charged offenses.[9] Defendant points out that while the jury found *not true* the allegation that he inflicted great bodily

---

[9]The jury returned these verdicts:

injury on Helen Rumsey in the course of robbing her, it found *true* both the allegation that he inflicted great bodily injury while attempting to murder her and the allegation that he inflicted great bodily injury on her during the burglary of her apartment. He contends these asserted inconsistencies in the verdicts establish that the jury was confused and unable to apply the facts to the law in violation of state statutory and decisional law and federal constitutional guarantees of fair trial, due process, reliable penalty determination, and freedom from cruel and unusual punishment.[10]

We disagree that the jury verdicts are necessarily inconsistent. Based on the evidence presented at trial, the jury reasonably could have concluded that the robbery of Helen Rumsey occurred, not when defendant stabbed her but rather when defendant threatened to shoot her with James Rumsey's gun if she did not produce any money. The evidence permits the reasonable inference that defendant formed the intent to steal from Helen Rumsey only after unsuccessfully searching for money in James Rumsey's wallet. That the jury found defendant formed the intent to steal from James Rumsey before he entered the Rumseys' apartment and attacked him does not suggest the jury was confused about the requisite timing of his specific intent to steal. There was evidence in the record from which both such scenarios could reasonably be inferred.

Even if we were to view the jury's findings on the sentencing allegations in counts 3, 4, and 5 as inconsistent, however, defendant is not entitled to

---

Count one: Guilty of first degree murder of James Rumsey with findings that the murder was committed during the commission or attempted commission of a robbery and a burglary and that defendant had personally used a knife. (§§ 187, 190.2, former subd. (a)(17)(i), (vii), 12022, subd. (b).)

Count two: Guilty of first degree robbery of James Rumsey with a finding that defendant personally used a knife. (§§ 211, 12022, subd. (b).)

Count three: First degree burglary with a finding that defendant intentionally inflicted great bodily injury on Helen Rumsey. (§§ 459, 12022.7.)

Count four: First degree robbery of Helen Rumsey, with findings that defendant personally used a firearm but *did not* inflict great bodily injury. (§§ 211, 12022.5, 12022.7.)

Count five: Attempted murder of Helen Rumsey, with findings that defendant personally used a knife, personally used a firearm, and intentionally inflicted great bodily injury. (§§ 664/187, 12022, subd. (b), 12022.5, 12022.7.)

[10]As defendant explains, the jury found that he did not commit great bodily injury during the robbery of Helen Rumsey even though the evidence showed the stabbing took place before he took the money she handed him. According to defendant, this finding establishes that the jury did not understand the critical issue of the timing of defendant's formation of the intent to steal. He points to the jury's mid-deliberations request for clarification on the attempted murder count as further evidence of the jury's confusion on this point. The jury asked, "Is it attempted murder if great bodily injury was inflicted during the course of a robbery?" Finally, he argues, the jury's quandary over how to apply the facts to the law was exacerbated by the trial court's refusal to give the pinpoint instruction requested by defense counsel, discussed *ante* in part III.C.2., on the requisite temporal relationship between the intent to steal and the killing.

reversal on this basis. ■■■ It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand. (*People v. Palmer* (2001) 24 Cal.4th 856, 860-861 [103 Cal.Rptr.2d 13, 15 P.3d 234]; *People v. Santamaria, supra,* 8 Cal.4th at p. 911; *People v. Polowicz* (1992) 5 Cal.App.4th 1082, 1089 [7 Cal.Rptr.2d 640]; *People v. Pahl* (1991) 226 Cal.App.3d 1651, 1656 [277 Cal.Rptr. 656].) The United States Supreme Court has explained: "[A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient." (*United States v. Powell* (1984) 469 U.S. 57, 67 [105 S.Ct. 471, 478, 83 L.Ed.2d 461].)

We have conducted an independent review of the record and, as more fully discussed above, have determined there is sufficient evidence to support the convictions and findings rendered in this case. Thus, even if we assume for argument's sake that the jury verdicts were inconsistent, that conclusion does not, of itself, warrant reversal.

Nor does the existence of inconsistent verdicts imply that the jury must have been confused. (*U.S. v. Martinez de Ortiz* (7th Cir. 1990) 907 F.2d 629, 636.) An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict. (*People v. Santamaria, supra,* 8 Cal.4th at p. 911; *People v. Pahl, supra,* 226 Cal.App.3d at p. 1656.) Here, nothing in the record, other than the asserted inconsistency in the verdicts, suggests that the jury did not understand the principles governing the felony-murder doctrine. Contrary to defendant's assertion, the jury's request for clarification on the attempted murder charge does not suggest confusion about felony murder or the timing of defendant's specific intent to steal. A close reading of the record discloses that the jurors were unclear as to whether the felony-murder doctrine also applied to attempted murder and, at defense counsel's suggestion, the trial court responded to the jury's question by instructing that attempted murder requires a specific intent to kill.[11]

---

[11]Defendant mistakenly relies on various statutes to support his assertion he is entitled to reversal based on the alleged inconsistencies in the jury's findings. For example, he cites section 1156, which describes the procedures the trial court is to follow when the jury's first verdict is defective or inadequate. That situation is not implicated here.

## IV. PENALTY PHASE ISSUES

### A. *Admission of Evidence*

#### 1. *Testimony about gun use during 1980 robbery*

The prosecution presented testimony about a 1980 robbery of the proprietor of a small Los Angeles liquor store. One witness, Officer Lee Smith, described defendant's arrest for that crime and Smith's postarrest interview with defendant. According to Smith, although he could not recall having mentioned to defendant anything about a weapon before or during the interview, defendant stated at one point, "I didn't have a knife and I didn't have a gun . . . I'll be out of here in seventy-two hours."

The prosecutor had intended to also call as a witness the victim of the robbery, Kiro Horiuchi, but Horiuchi died before the penalty phase began. The prosecutor therefore sought to admit Horiuchi's 1980 preliminary hearing testimony under Evidence Code section 1291. After finding the witness unavailable, the trial court considered defense hearsay and relevancy objections to the evidence. With respect to relevancy, defense counsel pointed out that the transcript makes repeated references to defendant's use of a gun, contrary to a specific "not true" finding by the trial court on a firearm use allegation charged. Referring to the docket sheet in the prior matter, counsel observed that the case apparently involved a court trial at which the prosecution presented no evidence of gun use, and counsel noted that the trial court made an express "not true" finding on the sentencing allegation. He argued that because there was a "not true" finding on the gun use, the issue was not relevant and the prosecutor should not be permitted to relitigate it.

The prosecutor challenged defense counsel's characterization of the prior proceeding. Quoting from the minute order that reflected the trial court's "not true" finding, the prosecutor pointed out that defendant's 1980 robbery conviction, including the absence of evidence in support of the gun use allegation, was the result of a plea bargain. As he noted, the minute order included the notation "DA will not offer proof on [section] 12022.5, settlement is mid-term three years or less with probation open up to five years." He argued further that the jury was entitled to know the facts surrounding the prior violent incident, whether or not a conviction was obtained.

The trial court agreed with the prosecutor and found that the 1980 robbery conviction was the result of a plea bargain that included dropping the firearm-use allegation. It further agreed that the details of an alleged crime of violence, whether or not a conviction occurred, could be considered by

the jury and that robbery, by definition, is such a crime. The trial court then considered defense counsel's objections to specific portions of the offered transcript and ordered one of the witness's statements redacted to omit reference to a hearsay statement by the witness's wife. Later, the prosecutor read the prior testimony to the jury. In that testimony, the witness indicated that defendant had held a straw hat over some object in his hand and had said, "I don't want to shoot you," leading the witness to believe that defendant was holding a gun.[12]

Defendant acknowledges that under existing law evidence and testimony on the facts underlying prior felony convictions and criminal activity is admissible at the penalty phase of a capital trial. He points out, however, that principles of double jeopardy and due process require exclusion of evidence of prior conduct if the defendant was acquitted of charges based on that conduct. Because the trial court's "not true" finding on the gun-use enhancement allegation was tantamount to an acquittal, defendant argues, the references to gun use in the preliminary hearing testimony were admitted in violation of state and federal double jeopardy protections.

■■■ Section 190.3 permits the prosecution to present evidence of the facts surrounding a capital defendant's prior felony convictions and violent criminal activity as part of its case-in-aggravation at the penalty phase. (*People v. Stanley* (1995) 10 Cal.4th 764, 818-820 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People v. Benson* (1990) 52 Cal.3d 754, 788 [276 Cal.Rptr. 827, 802 P.2d 330]; *People v. Melton* (1988) 44 Cal.3d 713, 754 [244 Cal.Rptr. 867, 750 P.2d 741].) The statute also expressly provides, however, that evidence of prior criminal activity "for an offense for which the defendant was prosecuted and acquitted" is not admissible. (§ 190.3.) A defendant has been "prosecuted and acquitted" for such purposes "where the falsity of the charge had been judicially established." (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 132 [2 Cal.Rptr.2d 335, 820 P.2d 559], judg. vacated and remanded on other grounds *sub nom. Bacigalupo v. California* (1992) 506 U.S. 802 [113 S.Ct. 32, 121 L.Ed.2d 5].)

At the same time, however, an "acquittal" within the meaning of section 190.3 does not include a bargained-for dismissal, and admission of the facts

---

[12]The preliminary hearing testimony read to the jury states, in relevant part:
Question: "Would you tell the judge what [defendant] said to you?"
Answer: "He said, I have a gun, and I didn't believe him and I shoved the groceries that someone else had towards him and I stated 'get away.' "
Question: "When he said I had a gun, he was doing something with his hands?"
Answer: "He had it behind a big straw hat."
Question: "Did he tell you he had a gun?"
Answer: "Yes."
Question: "Did he hold his straw hat over some object he had in his hand?"
Answer: "Yes. He said 'I don't want to shoot you.' Then I realized it must be a gun."

underlying such a disposition, when it is presented in a later proceeding to determine the appropriate penalty for a different offense, does not violate a capital defendant's right to due process or the prohibition against double jeopardy. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1157; *People v. Melton, supra,* 44 Cal.3d at pp. 755, 756, fn. 17.) As we have explained, there is nothing improper or unfair in permitting the jury at the penalty phase of a capital trial to consider, in deciding whether death is the appropriate penalty for a later offense, all relevant circumstances surrounding prior criminal activity that was the subject of a plea bargain. (*People v. Melton, supra,* at p. 755.)

Here, we will assume, without deciding, that the trial court's "not true" finding on the gun use was a " 'judicial determination with respect to the truth or falsity of the charge' " (*People v. Bacigalupo, supra,* 1 Cal.4th at p. 131), barring its use at the penalty phase. Nonetheless, there was no error in admitting the prior preliminary hearing testimony to show the details and circumstances underlying the offense of which defendant *was* convicted, namely, the robbery itself. Significantly, the victim did not testify that he ever saw defendant holding a gun. Rather, the victim said defendant told him he had a gun and did not want to shoot. Defendant's threat to use a possibly nonexistent gun was thus a relevant circumstance underlying the robbery, which involves the felonious taking of the victim's personal property from his person and against his will by force or fear. (§ 211; see *People v. Cain, supra,* 10 Cal.4th at pp. 70-71 [no error in admitting evidence of acts constituting circumstances of simple battery where defendant had been previously convicted of that offense as a lesser included offense of charged offense of battery causing serious injury].)

Because the preliminary hearing testimony, including its references to defendant's claimed possession of a gun, was admitted to show the circumstances relating to the bargained-for robbery conviction, a proper consideration for the penalty jury under section 190.3, factor (c), its admission did not violate the proscription against double jeopardy. (*People v. Bacigalupo, supra,* 1 Cal.4th at pp. 134-135; *People v. Melton, supra,* 44 Cal.3d at p. 756, fn. 17.) Nor did its admission result in any unfairness. (*People v. Benson, supra,* 52 Cal.3d at pp. 788-789.) As noted, the evidence was limited to the facts supporting the prior conviction and did not indicate that defendant had in fact used a gun in the commission of that offense. (*People v. Cain, supra,* 10 Cal.4th at p. 71.) Moreover, the jury was informed of the "not true" finding on the gun-use enhancement and heard testimony by the investigating officer in the 1980 robbery case about his notation in the police report that defendant's modus operandi appeared to be a "simulated gun."

Defendant urges this court to reconsider the holdings of our decisions permitting introduction of evidence relating to the facts and circumstances

underlying prior felony convictions generally. In arguing that the admission of such evidence constitutes a deprivation of the rights to due process, impartial jury, and reliable capital penalty determination, he points to the United States Supreme Court's decision in *Taylor v. United States* (1990) 495 U.S. 575 [110 S.Ct. 2143, 109 L.Ed.2d 607]. There, the high court adopted a "formal categorical approach" to determining whether a prior state court conviction qualified for purposes of sentence enhancement under the federal Anti-Drug Abuse Act of 1968 that prohibited the federal district courts from looking beyond the record of the prior conviction to determine the underlying facts and circumstances. (*Taylor v. United States, supra,* at p. 600 [110 S.Ct. at p. 2159].) We have in previous decisions repeatedly rejected the identical argument that defendant raises here. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1178 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Stanley, supra,* 10 Cal.4th at pp. 819-820; *People v. Mayfield, supra,* 5 Cal.4th at p. 190, fn. 7; *People v. Wader* (1993) 5 Cal.4th 610, 656, fn. 8 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1243, fn. 14 [14 Cal.Rptr.2d 702, 842 P.2d 1].) As we have explained, *Taylor* is distinguishable. The statutory scheme established by section 190.3 " 'involves wholly different considerations than ordinary criminal sentencing' schemes" and " 'properly allows the jury to focus on the defendant's prior criminal conduct and propensity for violence, factors deemed relevant as possible aggravating circumstances.' " (*People v. Mayfield, supra,* at p. 190, fn. 7.)

Defendant further contends he was placed "twice in jeopardy" within the meaning of the federal Constitution's double jeopardy clause by the presentation of evidence relating to the facts underlying a prior felony conviction, characterizing such evidence as a retrial of the prior offense. We have previously considered and rejected this contention, finding no double jeopardy bar to the presentation of the details underlying a prior conviction at a later proceeding on the separate issue of penalty for a subsequent offense. (*People v. Osband, supra,* 13 Cal.4th at p. 711; *People v. Sanders* (1995) 11 Cal.4th 475, 543 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Garceau* (1993) 6 Cal.4th 140, 199-200 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People v. Bacigalupo, supra,* 1 Cal.4th at pp. 134-135.) So too have we previously considered and rejected the more specific argument defendant presents, that *Bullington v. Missouri* (1981) 451 U.S. 430 [101 S.Ct. 1852, 68 L.Ed.2d 270] compels the conclusion he was again placed in jeopardy when the jury was permitted to consider evidence of the 1980 robbery. (*People v. Wharton* (1991) 53 Cal.3d 522, 601-602, fn. 24 [280 Cal.Rptr. 631, 809 P.2d 290]; *People v. Melton, supra,* 44 Cal.3d at p. 756, fn. 17; *People v. McDowell* (1988) 46 Cal.3d 551, 568 [250 Cal.Rptr. 530, 763 P.2d 1269].) In *Bullington,* the United States Supreme Court held that double jeopardy protections

prohibit the state from seeking the death penalty on retrial after a trial court's granting of a new trial motion where the jury had set the penalty at life imprisonment rather than death. (*Bullington v. Missouri, supra,* at pp. 444-446 [101 S.Ct. at pp. 1860-1862].) Here, by contrast, no attempt has been made to prosecute or punish defendant anew for the crime he committed in 1980. *Bullington* is not controlling. (*People v. Wharton, supra,* at p. 602, fn. 24.)

Because defendant advances no compelling reasons to reconsider our existing precedents, we decline to do so.

In a different claim related to the evidence of the 1980 robbery, defendant asserts he received constitutionally inadequate representation because defense counsel failed to object to, or to seek a cautionary instruction on, a portion of Officer Smith's testimony about defendant's postarrest statements. He contends more specifically that the remark attributed to him, "I'll be out of here in seventy-two hours," was not relevant to any statutory factor in aggravation and should have been excluded.

We have long recognized that counsel's decision whether or not to object to inadmissible evidence is a matter of trial tactics. (*People v. Hayes, supra,* 52 Cal.3d at p. 621.) Because we accord great deference to trial counsel's tactical decisions, counsel's failure to object rarely provides a basis for finding incompetence of counsel. (*People v. Riel* (2000) 22 Cal.4th 1153, 1185 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Williams* (1997) 16 Cal.4th 153, 215 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Here, nothing in the record suggests defense counsel lacked a rational tactical reason for not objecting to Officer Smith's testimony. (See *People v. Pope* (1979) 23 Cal.3d 412, 426, fn. 16 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) For example, counsel could reasonably have viewed the officer's testimony as further support for the defense position that defendant did not actually use a weapon during the robbery. We find no incompetence on this record.

### 2. *Failure to strike improper testimony*

Prosecution witness Police Chief Nicholas of the Weed Police Department testified he had investigated an incident on September 26, 1986, in which George Toombs reported that defendant had shot a hole in the tire of Toombs's truck. When asked whether defendant had offered an explanation, the witness responded, "As I recall, he made a statement that he didn't have a firearm, he hadn't shot a gun or something of that nature, that it was a firecracker." When the witness answered "yes" to the prosecutor's next question asking whether defendant had also said something about Toombs,

defense counsel objected on relevancy grounds. After an unreported sidebar conference, the trial court sustained defense counsel's objection. The prosecutor asked no further questions of the witness.

A short time later, and outside the jury's presence, defense counsel clarified for the record that at the bench he had objected to the testimony about defendant's statements on the ground there was no evidence defendant had been advised of his rights before speaking with the officer, as required by *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]. Counsel also noted for the record the trial court had rejected his motion to exclude on that ground. When the court reminded defense counsel it had sustained his objection to a portion of the questioning about what the witness had heard defendant say about Toombs and that the prosecutor had ceased his questioning altogether, defense counsel indicated he had objected to the entire line of questioning and noted that some statements did come in.

Defendant contends the trial court erred in failing to strike the question and answer about defendant's statements explaining the September 26 incident. He asserts the evidence was irrelevant because it was unrelated to any statutory factor in aggravation under section 190.3. He argues that because the evidence portrayed him as untruthful, it prejudiced the jurors against him and invited them to depart from their "impartial fact-finding duty" in violation of his state and federal constitutional rights to fair trial, due process, reliability of verdicts, and fundamental fairness.

Respondent asserts defendant has failed to preserve his claim of error because defense counsel did not object to the challenged testimony on relevancy grounds. We find the record unclear. Although defense counsel initially objected to the prosecution's question as irrelevant, he later clarified for the record that the trial court had overruled his objection at the bench on *Miranda* grounds and noted that his motion to exclude was denied by the trial court. Counsel's making a record of the *Miranda* violation claim, however, does not foreclose the possibility he had also argued irrelevancy as a basis for exclusion. Because the trial court sustained the initial objection and the prosecutor ceased questioning, the record strongly suggests defense counsel raised more than one ground for keeping the evidence from the jury.[13]

In any event, we find no error. For purposes of section 190.3, "relevant evidence" is evidence relevant to the specific factors set forth in

[13]Defendant also asserts that the prosecution did not provide the requisite notice that it would present evidence of defendant's statements to the Weed police. We agree with respondent that defendant has not preserved this claim of error. Nothing in the record indicates defense counsel objected to the evidence on this ground. (*People v. Hines, supra,* 15

that provision. (*People v. Boyd* (1985) 38 Cal.3d 762, 773-774 [215 Cal.Rptr. 1, 700 P.2d 782].) Section 190.3, factor (b) permits the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence . . . ." The factor of violent criminal activity encompasses not only the existence of such activity but all the pertinent circumstances surrounding it (*People v. Ashmus, supra,* 54 Cal.3d at p. 985), and these circumstances may be shown through testimonial evidence. (*People v. Garceau, supra,* 6 Cal.4th at pp. 201-202.)

Here, the prosecution presented evidence that in 1986 defendant approached his former father-in-law George Toombs as he sat in his parked truck, shot the front tire, and then threatened Toombs with a handgun through the driver's side window. Toombs testified about the incident and, as previously noted, Police Chief Nicholas testified about his investigation. Although defendant's statement to the police denying his use of a gun is only marginally relevant to establishing that the crime actually occurred beyond a reasonable doubt, it arguably pertains to the broader circumstances surrounding the incident and was therefore admissible. Even if the statement should have been excluded as irrelevant to any statutory factor in aggravation, however, the prosecutor did not mention it again during summation and the testimony constituted such a minor portion of the case-in-aggravation as to render its admission harmless. (See *People v. Medina, supra,* 11 Cal.4th at pp. 765-766; *People v. Brown* (1988) 46 Cal.3d 432, 447 [250 Cal.Rptr. 604, 758 P.2d 1135].) For the same reason, we reject defendant's claim that defense counsel was incompetent for not promptly objecting when the prosecutor first inquired about defendant's statement. (*People v. Medina, supra,* at p. 770.)

### 3. *Evidence of prior felony convictions*

The prosecutor asked the trial court to admit into evidence at the penalty phase certified copies of three documents from a Siskiyou County criminal prosecution in which defendant pleaded guilty to the sale of methamphetamine, a felony under Health and Safety Code section 11379. These documents were the information, a minute order showing entry of the guilty plea, and a minute order entitled "Judgment and Sentencing." Defense counsel

---

Cal.4th at p. 1059; *People v. Medina* (1995) 11 Cal.4th 694, 771 [47 Cal.Rptr.2d 165, 906 P.2d 2].) In any event, the claim lacks merit because the notice was sufficient. (*People v. Pride, supra,* 3 Cal.4th 195, 258 ["the prosecutor is not prevented from introducing all the circumstances of a duly noticed incident or transaction simply because each and every circumstantial fact was not recited therein"].)

Defendant makes a similar claim regarding admission of statements he made to the officer who arrested him for the 1980 robbery in Southgate. This claim also fails for lack of a specific objection at trial and because the notice provided was sufficient.

objected to all three documents as irrelevant, noting that the packet of documents did not contain a judgment or sentencing order. Counsel pointed out that the document entitled Judgment and Sentencing simply stated that defendant had not appeared on the date set for judgment and sentencing. As to this document, counsel argued that a defendant's failure to appear is not a factor in aggravation; he also complained that the prosecution had not given proper notice of the issue in its notice of evidence in aggravation. With the prosecutor's assent, the trial court excluded the Judgment and Sentencing document. After redacting the minute order showing the guilty plea to omit reference to a misdemeanor charge, the trial court admitted that document and the information into evidence.

Defendant contends all the evidence should have been excluded as inadmissible hearsay. Because defense counsel objected to the challenged evidence on relevance grounds, and not on hearsay grounds, however, defendant has not preserved the issue. (Evid. Code, § 353; *People v. Champion, supra,* 9 Cal.4th at p. 918.)

Even if properly before us, defendant's claim lacks merit. ▮▮▮ Contrary to his assertion, the court documents were not offered to prove he committed the felony in question. Rather, they were introduced to show he had suffered a prior felony conviction, a factor in aggravation under section 190.3, factor (c). As we explained in *People v. Balderas* (1985) 41 Cal.3d 144 [222 Cal.Rptr. 184, 711 P.2d 480], evidence of a defendant's prior felony convictions is relevant to the penalty determination because it demonstrates "that the capital offense was undeterred by prior successful felony prosecutions." (*Id.* at p. 202, italics omitted.) Because the evidence was properly admitted for this purpose, we need not entertain defendant's request to reconsider the discussion in a concurring opinion signed by five justices approving use of a prior conviction to prove criminal activity involving force or violence under section 190.3, factor (b). (*People v. Ray* (1996) 13 Cal.4th 313, 363-369 [52 Cal.Rptr.2d 296, 914 P.2d 846] (conc. opn. of George, C. J.).) Nor do we accept defendant's contention that the state and federal Constitutions prohibit a jury from considering, as an aggravating circumstance under factor (c), a prior conviction for a felony that did not involve force or violence. We have previously considered and rejected this contention (*People v. Cain, supra,* 10 Cal.4th at pp. 75-76), and defendant provides no compelling reason to reopen the question here.

B. *Instructional Error Claims*

1. *Instruction on other criminal activity*

At the penalty phase, the prosecution presented testimony and other evidence relating to seven incidents of violent criminal activity. Andrew

Greene and John Rogers testified about one of them. According to their testimony, on November 28, 1986, defendant entered the Nightcap bar in Weed yelling obscenities and threatening Greene's life. When defendant reached into his own coat, Rogers pulled it off defendant's shoulders to reveal a holstered handgun that Rogers removed before calling the police.

After the presentation of this evidence, the trial court met with counsel to discuss jury instructions. The trial court said that it would give CALJIC No. 8.87 (1989 rev.) (5th ed. 1988) on considering violent criminal activity as an aggravating factor, and that it would include in that instruction a list of the criminal activity at issue based on the allegations in the prosecution's notice of aggravating factors and "consistent with what [it understood] to have been the evidence on the subject." The trial court read the proposed instruction to counsel with no immediate objection. The discussion then moved to CALJIC No. 8.86 on the use of prior felony convictions in aggravation. Counsel for both sides agreed with the trial court's proposal to specify for the jury the two prior convictions at issue, one for robbery in 1980 and the other for the sale of methamphetamine in 1987. At this point, however, the trial court noted that on the list of violent criminal activity to be included in CALJIC No. 8.87 was the incident involving the victim of the 1980 robbery, Kiro Horiuchi, and the court expressed its concern that the jury might be led to double-count that evidence as both violent criminal activity and a prior conviction. In response to the trial court's question whether it should strike the reference to the robbery under the prior conviction instruction or strike the allegation of force and violence on Kiro Horiuchi, defense counsel suggested that the latter course would be appropriate. The trial court accepted the suggestion and deleted the reference to the victim of the 1980 robbery in CALJIC No. 8.87. The jury was instructed accordingly.[14]

---

[14]The trial court's instruction read: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal activity which involved the express or implied use of force or violence, or the threat of force or violence, to wit: [¶] That the defendant, by force and violence, assaulted Beverly Armstrong on December 14, 1971, at Town and Imperial Highway, Los Angeles, California. [¶] That the defendant, by force and violence, assaulted Leon Johnson with a knife on February 9, 1985, at 413 California Street, Weed, California. [¶] That the defendant, by force and violence, assaulted Willie Bea Lewis (Shumlai) on January 20, 1986, at 603 Como Street, Weed, California. [¶] That the defendant, by force and violence, assaulted Debra Swango on August 28, 1986, at 603 Como Street, Weed, California. [¶] That the defendant, by force and violence, assaulted George Toombes [*sic*] with a firearm on September 26, 1986, at 175 North Weed Blvd., Weed, California. [¶] Before a juror may consider any of such alleged criminal activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal activity. A juror may not consider any evidence of any other criminal activity as an aggravating circumstance. [¶] It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose."

Defendant contends the trial court's instruction was wrong because it omitted from the list of incidents of violent criminal activity the allegation involving Andrew Greene at the Nightcap bar. He argues the trial court's instruction failed to inform the jury that it had to find that alleged incident to have occurred beyond a reasonable doubt before it could consider it in aggravation, thus violating his federal constitutional rights to due process, fair trial, trial by jury, and freedom from cruel and unusual punishment.

In compiling its original list of the violent incidents the jurors could consider in aggravation if they were convinced beyond a reasonable doubt the event in question had occurred, the trial court relied on the allegations in the prosecution's original notice of aggravating factors. The incident involving Greene was not included in that notice but in a later-filed supplemental notice adding that incident to the six listed on the original notice. But counsel for neither side brought the oversight to the trial court's attention.

Respondent argues that because a trial court is under no obligation to specify for the jury the violent criminal activity that could be considered (*People v. Medina, supra,* 11 Cal.4th at pp. 770-771), it was incumbent on defense counsel to point out the omission of the Greene incident and request a more complete instruction on the subject. We agree. The instruction as given was not erroneous, only incomplete, and "a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285].)

In any event, there is no reasonable possibility the jury at the penalty phase misunderstood the law about its consideration of unadjudicated criminal activity. (*People v. Kelly* (1992) 1 Cal.4th 495, 525-526 [3 Cal.Rptr.2d 677, 822 P.2d 385].) The trial court instructed the jury generally to "consider all of the evidence which has been received during any part of the trial" and to be guided by the statutory factors, including "[t]he presence or absence of criminal activity by the defendant . . . which involved the use or attempted use of force or violence or the express or implied threat to use force or violence . . . ." (CALJIC No. 8.85.) That instruction was followed by CALJIC No. 8.87, which began with the agreed-upon listing of five incidents of alleged violent criminal activity. The instruction continued: "Before a juror may consider *any of such alleged criminal activity* as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit *such criminal activity.* A juror may not consider any evidence of any *other* crime as an aggravating factor." (*Ibid.,* italics added.) Given the charge, the jury may have understood it was

not to consider the Greene incident as a factor in aggravation because it was not "any of such alleged criminal activity" recounted in the instruction. If so, the omission of the Greene incident helped rather than harmed defendant. (*People v. Riel, supra,* 22 Cal.4th at p. 1214.) But even if the jury believed it could consider evidence of the threat to Greene in the same manner as the other evidence of violent criminal activity presented by the prosecution at the penalty phase, it would also have understood that the incident could be used as a factor in aggravation only on proof beyond a reasonable doubt, as the instruction directed. Under either scenario, there is no reasonable likelihood the jury understood the instructions to mean the Greene incident could be used as a factor in aggravation whether or not the prosecution proved beyond a reasonable doubt that defendant had engaged in that conduct. For the same reason, we reject defendant's claim that counsel's failure to bring the oversight to the trial court's attention constitutes the ineffective assistance of counsel.

In a related claim, defendant asserts the trial court erred when it failed to inform the jury under CALJIC No. 8.87 that the evidence of defendant's 1980 robbery of Kiro Horiuchi could not be considered in aggravation as violent criminal activity unless it was proved beyond a reasonable doubt that defendant committed such act. He contends that although the trial court instructed the jury that the evidence could be considered for the purpose of showing defendant had suffered a prior conviction for robbery, both the testimony adduced at trial and the prosecutor's closing argument emphasized that the evidence supported a finding of defendant's use of force and violence under section 190.3, factor (b). As respondent correctly points out, however, defendant is barred from challenging the trial court's instruction because the error, if any, was invited. ■ As we have explained, "[t]he doctrine of invited error bars defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice'" to request the instruction. (*People v. Lucero* (2000) 23 Cal.4th 692, 723 [97 Cal.Rptr.2d 871, 3 P.3d 248]; *People v. Cooper* (1991) 53 Cal.3d 771, 831 [281 Cal.Rptr. 90, 809 P.2d 865].) Defense counsel made a deliberate, tactical choice when, in response to the trial court's expression of concern over the possible double-counting of the evidence concerning the 1980 robbery, he suggested the reference to Kiro Horiuchi be removed from the list of alleged incidents of violent criminal activity in CALJIC No. 8.87. Defendant cannot now complain of an asserted deficiency resulting from a revision that defense counsel suggested.

### 2. *Failure to instruct on elements of unadjudicated criminal activity*

Defendant contends that when, as here, jurors are presented with evidence of unadjudicated criminal acts under section 190.3, factor (b), and instructed

that they may consider such evidence in aggravation only after finding beyond a reasonable doubt that the criminal acts occurred, it is error not to inform them also how the alleged activity constitutes a crime. He notes that his trial counsel did not request such instructions, but he asks us to reexamine our prior decisions holding, as a general rule, that a trial court need not, on its own initiative, instruct on the elements of unadjudicated criminal activity. Although defendant devotes a considerable portion of his appellate brief to elaborating the grounds for his challenge to the existing rule, we have previously considered and rejected each of his arguments. ▮ Instructions to the jury on the elements of unadjudicated crimes are not required by logic or by the constitutional guarantees of due process, fundamental fairness, right to a fair trial, equal protection, or reliability of penalty. (*People v. Barnett, supra,* 17 Cal.4th at p. 1175; *People v. Osband, supra,* 13 Cal.4th at p. 704; *People v. Hardy* (1992) 2 Cal.4th 86, 206-207 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Ghent* (1987) 43 Cal.3d 739, 773 [239 Cal.Rptr. 82, 739 P.2d 1250].) Nor does the state or federal Constitution require a defendant's personal waiver when, for tactical reasons, counsel refrains from requesting that the trial court instruct the jury on the elements of unadjudicated crimes. (*People v. Barnett, supra,* 17 Cal.4th at p. 1175; *People v. Johnson* (1993) 6 Cal.4th 1, 49 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People v. Cooper, supra,* 53 Cal.3d at pp. 827-828.)

Defendant contends trial counsel's failure to request jury instructions on the elements of the unadjudicated criminal activity in his case constituted ineffective assistance of counsel.

The rule imposing no duty on a trial court to instruct on the elements of crimes offered as incidents of violent criminal activity under section 190.3, factor (b) recognizes that "a defendant for tactical considerations may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of . . . other crimes, perhaps because he fears that such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he should live or die." (*People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) Here, in light of the number of prior violent incidents the prosecution presented at the penalty phase, defense counsel reasonably may have been concerned that instruction on the elements of the various criminal activities would place undue focus on such crimes. (*People v. Hart* (1999) 20 Cal.4th 546, 651 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 592 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Because the record fails to show defense counsel lacked any rational tactical reason for not requesting instruction on the elements of the factor (b) crimes, defendant has not established deficient performance by his counsel. (*People v. Pope, supra,* 23 Cal.3d at p. 426, fn. 16.)

### 3. *Multiple use of term "circumstances"*

Defendant contends the various uses of the term "circumstances" in the standard jury instructions at the penalty phase misled and confused the jury, in violation of the due process clause and other federal constitutional guarantees. He asserts that a jury could confuse the special circumstances found true during the guilt phase with the aggravating circumstances necessary for imposition of the death penalty, particularly in a case such as his, in which the same evidence was used to prove both special circumstances and aggravating circumstances.

■ Defendant's complaint appears to be with CALJIC No. 8.85, which directs the penalty jury to take into consideration "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." (See also § 190.3, factor (a).) If defendant's argument is that the standard instructions at the penalty phase invite the jury to artificially inflate the aggravating weight of the underlying offense by considering the same evidence under more than one statutory factor in aggravation, we have in prior decisions held that the standard instructions do not inherently encourage such double-counting under section 190.3. (*People v. Ayala* (2000) 24 Cal.4th 243, 289 [99 Cal.Rptr.2d 532, 6 P.3d 193]; *People v. Barnett, supra,* 17 Cal.4th at p. 1180; *People v. Sanchez* (1995) 12 Cal.4th 1, 78 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People v. Medina, supra,* 11 Cal.4th at p. 779.)

Nor does defendant point to anything in the record suggesting any possible confusion by the jury in his case. Here, the prosecutor's closing argument suggested how each piece of evidence fit under the specified statutory factors. He also told the jury, in language similar to CALJIC No. 8.88, also given to the jury, that it should not engage in a "mere mechanical counting of factors on each side of an imaginary scale" and that, in determining which penalty is justified, it should consider the totality of the aggravating circumstances with the totality of the mitigating circumstances. In light of the prosecutor's remarks and the standard instructions about the weighing of aggravating and mitigating circumstances given in this case, we find no reasonable likelihood the jurors were misled or confused in the manner defendant suggests. (*People v. Ayala, supra,* 24 Cal.4th at pp. 289-290.)

### C. *Prosecutorial Misconduct*

### 1. *Comment on failure to present mitigating evidence*

During closing argument, the prosecutor reviewed the various aggravating and mitigating factors to be considered in determining penalty. In urging the

jury to find that the aggravating factors outweighed those in mitigation, the prosecutor stated in relevant part: "I suggest to you that there is no evidence of that [sympathetic] nature. I mean you can grope as you might but you haven't heard it because it—it just does not—does not exist. . . . You have abundant evidence of aggravating factors, including the crime itself and the evidence you heard during the penalty phase. I suggest to you, you have no evidence that would mitigate the enormity or the gravity of this particular crime. . . . I suggest to you there are no mitigating circumstances."

Defendant asserts the prosecutor's statements were an impermissible comment on his failure to testify, in violation of *Griffin v. California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].

Because defense counsel neither objected to the prosecutor's remarks on this or any other basis, nor requested an admonition from the trial court to cure any perceived harm, defendant's claim has not been preserved on appeal. (*People v. Lucero, supra,* 23 Cal.4th at p. 719.) It lacks merits in any event.

■■■ Under the Fifth Amendment of the federal Constitution, a prosecutor is prohibited from commenting directly or indirectly on an accused's invocation of the constitutional right to silence. Directing a jury's attention to a defendant's failure to testify at trial runs the risk of inviting the jury to consider the defendant's silence as evidence of guilt. (*Griffin v. California, supra,* 380 U.S. at pp. 614-615 [85 S.Ct. at pp. 1232-1233]; *People v. Frye, supra,* 18 Cal.4th at p. 1019.) The prosecutor is permitted, however, to comment on the state of the evidence, "including the failure of the defense to introduce material evidence or to call witnesses." (*People v. Mincey* (1992) 2 Cal.4th 408, 446 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

Defendant asserts the prosecutor's reference to the nonexistence of mitigating evidence was a comment on his failure to testify because it suggested that the only person who could have provided such evidence, defendant, did not do so at the penalty phase. This is a strained reading of the prosecutor's remarks. The prosecutor did not impermissibly argue to the jury that the People's evidence was uncontradicted or unrefuted because defendant failed to take the witness stand. (See, e.g., *People v. Medina* (1974) 41 Cal.App.3d 438, 459-460 [116 Cal.Rptr. 133].) The prosecutor's remarks were not directed, expressly or impliedly, at defendant's invocation of the right to silence at the penalty phase. Rather, they concerned the dearth of mitigating evidence, a proper subject for argument. (See *People v. Avena* (1996) 13 Cal.4th 394, 443 [53 Cal.Rptr.2d 301, 916 P.2d 1000] [no error under *Griffin v. California, supra,* 380 U.S. 609, where prosecutor merely pointed out lack

of mitigating evidence supported his argument that balance of aggravating and mitigating factors favored sentence of death].) Nor is there a reasonable likelihood that the jury understood the prosecutor's remarks as an improper comment on defendant's failure to testify at the penalty phase. (*People v. Mincey, supra*, 2 Cal.4th at p. 446.) Although defendant did not take the witness stand at the penalty phase, he did testify in his own behalf during the guilt phase, and the jury was given the standard instruction that its penalty determination was to be based on all of the evidence received during the entire trial. Nothing in the prosecutor's remarks suggested that defendant's testimony at the guilt phase could not be considered as mitigating evidence for purposes of determining penalty. Given defendant's testimony and the proper scope of the prosecutor's comments, we conclude there was no *Griffin* error or other misconduct.

Defendant further contends the prosecutor's summation to the jury impermissibly treated the absence of mitigating factors as an aggravating factor, in violation of *People v. Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861]. *Davenport* cautioned prosecutors against arguing that the absence of mitigating evidence should itself be considered a factor in aggravation because such argument was likely to confuse the jury as to the proper meaning of aggravation and mitigation under section 190.3. (*People v. Davenport, supra*, at pp. 288-290.) A prosecutor may, however, properly point out to the jury the lack of evidence in support of a mitigating factor. (*People v. Bacigalupo, supra,* 1 Cal.4th at p. 144.)

Because defense counsel did not object to the prosecutor's remarks now being challenged, the issue has not been preserved for appeal. (*People v. Hines, supra,* 15 Cal.4th at p. 1064.) Even if properly before us, the claim lacks merit. The prosecutor never stated or suggested that the nonexistence of mitigating evidence was itself an aggravating factor. (*Id.* at p. 1063.) Fairly read, and as previously discussed, the prosecutor's remarks expressed the view that the evidence of aggravating factors, coupled with the dearth of mitigating evidence, supported a penalty of death over life imprisonment. There was no impropriety in the argument.

### 2. *Argument unrelated to statutory factors*

In reviewing the evidence for the jury during closing argument, the prosecutor asserted that defendant's statements to an arresting officer in 1980 showed him to be "con-wise" and manipulative. The prosecutor also recalled for the jury the officer's testimony that after he had noticed track marks on defendant's arms and started to examine them, defendant's personality changed from cooperative and passive to abrasive. The prosecutor then

characterized defendant's testimony at the guilt phase as an attempt to manipulate the jury, stating, "We've got a man, ladies and gentlemen, who has been violent and . . . , when held accountable for his conduct, has tried to manipulate the system."

█ Defendant asserts the prosecutor's argument was an attack on his personality and character that was irrelevant to any of the statutory factors in aggravation and therefore improper under the reasoning of *People v. Boyd, supra,* 38 Cal.3d 762, and violative of his federal constitutional rights.

Because defense counsel neither objected to the prosecutor's remarks nor sought an admonition, defendant's claim of error is not preserved for appellate review. (*People v. Smithey, supra,* 20 Cal.4th at p. 998.) In any event, the claim lacks merit.

Section 190.3 provides: "[The jury] shall impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances. If [it] determines that the mitigating circumstances outweigh the aggravating circumstances [it] shall impose a sentence of confinement in the state prison for a term of life without the possibility of parole." Thus, the law requires the jury to decide the appropriate penalty "by a process of weighing the specific factors listed in the statute." (*People v. Boyd, supra,* 38 Cal.3d at p. 773; see § 190.3, factors (a)-(k) [listing the relevant considerations].) Because section 190.3, factor (k) refers to "any other circumstance that extenuates the gravity of the crime" rather than to evidence enhancing it, evidence of a defendant's background and good character is admissible to extenuate the crime, but the prosecutor may not offer evidence of a defendant's bad character under this factor as part of its case-in-aggravation at the penalty phase. (*People v. Boyd, supra,* at pp. 774-776; see also *People v. Edelbacher* (1989) 47 Cal.3d 983, 1033 [254 Cal.Rptr. 586, 766 P.2d 1].) As we explained in *Boyd,* "[e]vidence of defendant's background, character, or conduct which is not probative of any specific listed factor would have no tendency to prove or disprove a fact of consequence to the determination of the action, and is therefore irrelevant to aggravation." (*People v. Boyd, supra,* at p. 774.)

But this restriction affects only the admission of evidence. At the penalty phase of a capital trial, a prosecutor is permitted to argue any reasonable inferences from properly admitted evidence of a defendant's prior violent crime, even if such inferences relate to the defendant's character as revealed in the prior violent crime itself or in its surrounding circumstances. (*People v. Avena, supra,* 13 Cal.4th at p. 439.) Here, the prosecutor did not argue that defendant's character was, in itself, an aggravating factor. Thus, we reject this claim of prosecutorial misconduct in argument.

### 3. *Lack of remorse*

The prosecutor explained to the jurors during summation that they could consider defendant's lack of remorse and argued that "[n]owhere in this trial did you see any evidence of any remorse on his behalf." Defendant asserts the prosecutor's comment was unrelated to any of the statutory factors enumerated in section 190.3 and therefore irrelevant. Because there was no timely objection to the remark or request for admonition, defendant is precluded from now raising the issue. (*People v. Holt, supra,* 15 Cal.4th at p. 691.) Even if defendant's claim was properly preserved for appellate review, however, it is contrary to law. (*Ibid.* [no statutory bar to a logical comment on defendant's lack of remorse].) As we have explained, "the presence or absence of remorse is a factor ' "universally" deemed relevant to the jury's penalty determination.' " (*People v. Marshall* (1996) 13 Cal.4th 799, 855 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) Here, because the jury would not have understood the prosecutor's remarks as an invitation to consider lack of remorse as a factor in aggravation, those remarks were not improper. (*People v. Mendoza, supra,* 24 Cal.4th at p. 187; *People v. Proctor, supra,* 4 Cal.4th at p. 545.)

Defendant acknowledges that we have consistently rejected claims of prosecutorial misconduct based on a prosecutor's reference to the defendant's lack of remorse. He argues, however, that his case is distinguishable from our prior decisions because his trial counsel presented no testimony or other mitigating evidence at the penalty phase. He points out that in *People v. Beardslee* (1991) 53 Cal.3d 68 [279 Cal.Rptr. 276, 806 P.2d 1311], we concluded that the prosecutor was entitled to comment on defendant's lack of remorse after the defense had called three witnesses at the penalty phase who testified on that subject. (*Id.* at p. 114.) Here, defendant contends, the prosecutor's comment infringed his constitutional rights not to present evidence and to remain silent.

Although defendant has identified a factual distinction between his case and some of our decisions finding no misconduct in a prosecutor's argument about lack of remorse, our survey of the cases in this area indicates that the cited difference is not significant. ▪▪ We have found no impropriety in a prosecutor's reference to a lack of remorse even when the defense did not present penalty phase evidence of the defendant's remorsefulness or argue that point as a reason for imposing life imprisonment over death. (See *People v. Bemore* (2000) 22 Cal.4th 809, 855 [94 Cal.Rptr.2d 840, 996 P.2d 1152] [listing cases].) Indeed, we have found no impropriety in a prosecutor's comment on the defendant's lack of remorse in a case similar to this one. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1067-1068 [17 Cal.Rptr.2d

174, 846 P.2d 756], revd. on another ground *sub nom. Stansbury v. California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293].) In *Stansbury*, as here, the defense presented no evidence at the penalty trial. (4 Cal.4th at p. 1062.)

Defendant asks us to reconsider our holding permitting a prosecutor to comment on lack of remorse in light of federal constitutional principles guaranteeing the rights to remain silent, and to fair trial, due process, and a reliable penalty determination. He advances no compelling reason for doing so, however. So long as the prosecutor's argument does not amount to a direct or indirect comment on the defendant's invocation of the right to silence at the penalty phase (*People v. Welch, supra,* 20 Cal.4th at p. 763; *People v. Crittenden, supra,* 9 Cal.4th at p. 147), it does not violate constitutional principles. (See also *People v. Bemore, supra,* 22 Cal.4th at pp. 854-855 [rejecting multipronged constitutional attack on prosecutor's invocation of lack of remorse during closing argument]; *People v. Stansbury, supra,* 4 Cal.4th at p. 1068 [comment on lack of remorse does not violate Eighth Amendment].)

### D. *Ineffective Assistance of Counsel*

 In addition to the various claims of ineffective representation already discussed, defendant complains of his counsel's inadequacy at the penalty phase for not presenting any evidence in mitigation and delivering a meager closing argument that offered no reasons for sparing his client's life.

 "To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*People v. Kipp, supra,* 18 Cal.4th at p. 366, quoting *Strickland v. Washington, supra,* 466 U.S. at p. 686 [104 S.Ct. at p. 2064].) We presume "counsel's conduct falls within the wide range of reasonable professional assistance" (*Strickland v. Washington, supra,* at p. 689 [104 S.Ct. at p. 2065]; *People v. Earp, supra,* 20 Cal.4th at p. 896), and accord great deference to counsel's tactical decisions. (*People v. Frye, supra,* 18 Cal.4th at p. 979.) Because it is inappropriate for a reviewing court to speculate about the tactical bases for counsel's conduct at trial (*People v. Wilson, supra,* 3 Cal.4th at p. 936), when the reasons for counsel's actions are not readily apparent in the record, we will not assume constitutionally inadequate representation and reverse a conviction unless the appellate

record discloses " 'no conceivable tactical purpose' " for counsel's act or omission. (*People v. Hines, supra,* 15 Cal.4th at p. 1065, quoting *People v. Diaz* (1992) 3 Cal.4th 495, 558 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; see also *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134] [if appellate record sheds no light on reasons for counsel's action or omission, claim of ineffective assistance of counsel more appropriately decided in habeas corpus proceeding].)

 Defendant faults counsel for failing to present any evidence of his good character, his history of mental illness, or his past difficulties, or to otherwise portray him as a "human being with positive qualities." For example, he asserts, counsel knew defendant had not eaten or slept in the days before the capital offense, knew his client was homeless and had been ingesting drugs and alcohol, and was informed defendant was trying to earn a living around the time of the crimes. But the appellate record does not disclose the existence, availability, or relative weight of such evidence. Nor does it suggest the reasons counsel may have had for declining to present such evidence. On the record before us, defendant cannot establish either incompetence of counsel or prejudice.[15] (*People v. Bolin* (1998) 18 Cal.4th 297, 345 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Medina, supra,* 11 Cal.4th at p. 773; *People v. Cudjo* (1993) 6 Cal.4th 585, 634 [25 Cal.Rptr.2d 390, 863 P.2d 635]; *People v. Diaz, supra,* 3 Cal.4th at p. 566.)

Nor can we conclude on this record that defense counsel's closing argument amounted to inadequate representation. Counsel's argument was admittedly brief, comprising only two pages of transcript. But "[t]he effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality." (*People v. Cudjo, supra,* 6 Cal.4th at pp. 634-635; see also *People v. Padilla, supra,* 11 Cal.4th at p. 949.)

Defendant asserts that counsel's failure to present any evidence, testimony, or substantial argument necessarily resulted in an unreliable death verdict in violation of his federal constitutional rights not only to the effective assistance of counsel, but also to due process, fundamental fairness,

---

[15]The three federal decisions defendant cites in support of his assertion that counsel's failure to present mitigating evidence, coupled with a weak closing argument, resulted in an unreliable death verdict are distinguishable. In each of those cases, the issue of counsel's incompetence was raised in a petition for writ of habeas corpus and was decided after a full evidentiary hearing on the question. (*Clabourne v. Lewis* (9th Cir. 1995) 64 F.3d 1373; *Tyler v. Kemp* (11th Cir. 1985) 755 F.2d 741; *King v. Strickland* (11th Cir. 1984) 748 F.2d 1462.) By contrast, to find incompetence on the silent record before us would require us to engage in speculation, which we decline to do. (See *People v. Wrest* (1992) 3 Cal.4th 1088, 1116 [13 Cal.Rptr.2d 511, 839 P.2d 1020].)

and freedom from cruel and unusual punishment. We have repeatedly stressed, however, that a defense counsel's failure to present mitigating evidence at the penalty phase does not make the proceeding unreliable in constitutional terms so long as (1) the prosecution has discharged its burden of proof at both phases of trial consistently with the rules of evidence and a constitutionally sound death penalty scheme; (2) the death verdict was rendered in accordance with proper instructions and procedures; and (3) the penalty jury considered the relevant mitigating evidence, if any, that the defendant has chosen to introduce. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1372 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Stansbury, supra,* 4 Cal.4th at p. 1063; *People v. Sanders* (1990) 51 Cal.3d 471, 526 [273 Cal.Rptr. 537, 797 P.2d 561].) As our rejection of defendant's various claims of trial error makes clear, the standard for a reliable and fair penalty determination has been met in this case.

E. *Constitutionality of California's Death Penalty Scheme*

Defendant challenges the constitutionality of California's 1978 death penalty scheme on numerous grounds, all of which we have rejected in earlier decisions. We see no reason to reconsider those decisions here.

We have held:

 There is no constitutional infirmity in permitting the use of the same facts to sustain a first degree felony-murder conviction and a felony-murder special-circumstance finding at the guilt phase, and to establish a factor in aggravation under section 190.3, factor (a), at the penalty phase. (*People v. Millwee, supra,* 18 Cal.4th at pp. 164-165, fn. 35; *People v. Ray, supra,* 13 Cal.4th at p. 358; see also *People v. Melton, supra,* 44 Cal.3d at pp. 767-768 [no constitutional impediment in permitting penalty jury to separately consider more than one felony-murder special circumstance under § 190.3, factor (a), even where killing occurred during indivisible transaction with a single criminal intent].)

The admission of evidence of unadjudicated crimes at the penalty phase does not deny a defendant due process or any other federal constitutional guarantee. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1054; *People v. Champion, supra,* 9 Cal.4th at p. 950; *People v. Bacigalupo* (1993) 6 Cal.4th 457, 478 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

California's death penalty sufficiently narrows the class of death-eligible defendants. (*People v. Mendoza, supra,* 24 Cal.4th at pp. 191-192; *People v. Barnett, supra,* 17 Cal.4th at p. 1179; *People v. Marshall* (1990) 50 Cal.3d 907, 946 [269 Cal.Rptr. 269, 790 P.2d 676].)

The statutory factors in aggravation are not impermissibly vague or otherwise improper. (*People v. Lucero, supra,* 23 Cal.4th at p. 741; *People v. Earp, supra,* 20 Cal.4th at p. 899; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975-977 [114 S.Ct. 2630, 2636-2638, 129 L.Ed.2d 750] [§ 190.3, factors (a) and (b) not unconstitutionally vague].)

Written findings by the penalty phase trier of fact are not constitutionally required. (*People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].) Nor does the federal Constitution demand that in order to return a verdict of death, the penalty jury must find that sentence to be the appropriate penalty beyond a reasonable doubt. (*People v. Bemore, supra,* 22 Cal.4th at p. 859; *People v. Hayes, supra,* 52 Cal.3d at p. 643.)

Permitting the district attorney of each county the discretion to decide in which cases to seek the death penalty does not amount, in and of itself, to a constitutional violation. (*People v. Earp, supra,* 20 Cal.4th at p. 905; *People v. Ray, supra,* 13 Cal.4th at p. 359; *People v. Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081].) Defendant suggests that race played an improper role in the prosecutor's charging decision in his case. Other than the bare fact defendant is African-American and the victim was White, there is nothing in the appellate record from which to infer that the prosecutor's decision to seek the death penalty was racially motivated, and we decline to speculate on the matter.

Neither the state nor the federal Constitution requires us to conduct a proportionality review of defendant's death sentence by comparing the facts of defendant's case with those of other defendants not sentenced to death. (*People v. Lucero, supra,* 23 Cal.4th at p. 741 [no constitutional obligation to perform intercase proportionality review]; *People v. Earp, supra,* 20 Cal.4th at p. 905; *People v. Crittenden, supra,* 9 Cal.4th at pp. 155-156.) Defendant is entitled, on request, to intracase proportionality review under article I, section 15 of the California Constitution to determine whether his sentence is proportionate to his individual culpability. (*People v. Riel, supra,* 22 Cal.4th at pp. 1223-1224; *People v. Champion, supra,* 9 Cal.4th at p. 951, fn. 35; *People v. Bacigalupo, supra,* 1 Cal.4th at pp. 151-152.) Assuming defendant is making such a request, we find imposition of the death penalty in this case is not so disproportionate to his individual culpability as to warrant reversal of his sentence. (See *People v. Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697] [in determining whether sentence amounts to cruel or unusual punishment, reviewing court considers circumstances of offense and defendant's personal characteristics].) We recognize that, as defendant points out, there was no finding he

intended to kill. But defendant killed an unarmed and unwary victim by stabbing him in the neck during a robbery committed in the victim's own home. In view of these circumstances, the penalty is not disproportionate. (*People v. Smithey, supra,* 20 Cal.4th at pp. 1222-1223; *People v. Bacigalupo, supra,* 1 Cal.4th at pp. 151-152; *People v. Lewis* (1990) 50 Cal.3d 262, 285-286 [266 Cal.Rptr. 834, 786 P.2d 892]; *People v. Carrera* (1989) 49 Cal.3d 291, 346 [261 Cal.Rptr. 348, 777 P.2d 121].)

Defendant faults his counsel for not objecting to the "triple use" of evidence relating to his intent to steal and to the other asserted constitutional infirmities in California's death penalty scheme defendant has raised on appeal. Defendant has not made the requisite showing of both deficient performance by counsel and prejudice resulting from counsel's omissions. As we have observed, rarely will the failure to object establish incompetence of counsel, because the decision whether to raise an objection is inherently tactical. (*People v. Scott* (1997) 15 Cal.4th 1188, 1223 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Moreover, because we have declined defendant's request to reconsider our previous decisions holding the challenged aspects of California's death penalty law constitutional, defense counsel's failure to raise the same arguments below did not prejudice defendant.

### F. *Cumulative Prejudice*

Defendant contends the cumulative effect of the asserted errors resulted in a miscarriage of justice warranting reversal of the judgment. In all but one instance, we have rejected defendant's claims of error. When error did occur, we found it was not prejudicial. Defendant was not deprived of his right to a fair trial or a reliable penalty determination.

### V. Conclusion

We affirm the judgment in its entirety.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the opinion of the court in all respects save one: I would vacate the sentence of death as unreliable, in violation of both the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution and also the cruel or unusual punishment clause of article I, section 17 of the California Constitution, because trial counsel—who would make practically no argument at all to persuade the jury to spare appellant's life—introduced no evidence whatsoever to serve as a basis for it to do so. (See *People v. Bradford* (1997) 15

Cal.4th 1229, 1385 [65 Cal.Rptr.2d 145, 939 P.2d 259] (conc. & dis. opn. of Mosk, J.) [implying that any sentence of death should be vacated as unreliable under the Eighth Amendment and article I, section 17 if trial counsel introduced in mitigation none of the available evidence]; *People v. Avena* (1996) 13 Cal.4th 394, 449-450 [53 Cal.Rptr.2d 301, 916 P.2d 1000] (dis. opn. of Mosk, J.) [same]; *People v. Lucas* (1995) 12 Cal.4th 415, 501-502 [48 Cal.Rptr.2d 525, 907 P.2d 373] (conc. & dis. opn. of Mosk, J.) [same]; *In re Ross* (1995) 10 Cal.4th 184, 216, fn. 1 [40 Cal.Rptr.2d 544, 892 P.2d 1287] (dis. opn. of Mosk, J.) [same]; *People v. Stansbury* (1995) 9 Cal.4th 824, 835 [38 Cal.Rptr.2d 394, 889 P.2d 588] (conc. & dis. opn. of Mosk, J.) [same], reiterating *People v. Stansbury* (1993) 4 Cal.4th 1017, 1074 [17 Cal.Rptr.2d 174, 846 P.2d 756] (conc. & dis. opn. of Mosk, J.), revd. *sub nom. Stansbury v. California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293] (by the court); *People v. Diaz* (1992) 3 Cal.4th 495, 577 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (conc. & dis. opn. of Mosk, J.) [same]; see also *People v. Howard* (1992) 1 Cal.4th 1132, 1197 [5 Cal.Rptr.2d 268, 824 P.2d 1315] (conc. & dis. opn. of Mosk, J.) [finding a sentence of death unreliable under the Eighth Amendment and article I, section 17 when trial counsel introduced in mitigation none of the available evidence, albeit at the defendant's request]; *People v. Sanders* (1990) 51 Cal.3d 471, 531-533 [273 Cal.Rptr. 537, 797 P.2d 561] (dis. opn. of Mosk, J.) [same]; *People v. Lang* (1989) 49 Cal.3d 991, 1059-1062 [264 Cal.Rptr. 386, 782 P.2d 627] (conc. & dis. opn. of Mosk, J.) [same]; *People v. Williams* (1988) 44 Cal.3d 1127, 1158-1161 [245 Cal.Rptr. 635, 751 P.2d 901] (conc. & dis. opn. of Mosk, J.) [to similar effect under the Eighth Amendment]; *People v. Deere* (1985) 41 Cal.3d 353, 360-368 [222 Cal.Rptr. 13, 710 P.2d 925] [same].)

Appellant's petition for a rehearing was denied June 27, 2001.